# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| _____ | : | |
| 2009 CAIOLA FAMILY TRUST, a New Jersey trust, and LOUIS CORTESE, | : : : | |
| Plaintiffs, | : : | |
| v. | : : | C.A. No. 8028-VCP |
| PWA, LLC, a Kansas limited liability company, and WARD KATZ, | : : : : | |
| Defendants, | : : | |
| and | : : | |
| DUNES POINT WEST ASSOCIATES, LLC, a Delaware limited liability company, | : : : : | |
| Nominal Defendant. | : : | |
| _____ | : | |

## MEMORANDUM OPINION

Date Submitted: June 24, 2015
Date Decided: October 14, 2015

Kurt M. Heyman, Esq., Patricia L. Enerio, Esq., PROCTOR HEYMAN ENERIO LLP, Wilmington, Delaware; Gary M. Fellner, Esq., Michael J. Naporano, Esq., PORZIO BROMBERG & NEWMAN P.C., New York, New York; *Attorneys for Plaintiffs*.

Thomas E. Hanson, Jr., Esq., Patricia A. Winston, Esq., Albert J. Carroll, Esq., MORRIS JAMES LLP, Wilmington, Delaware; *Attorneys for Defendants*.


**PARSONS, Vice Chancellor.**

This case involves a dispute between members of a limited liability company that owns an apartment complex in Lenexa, Kansas. The plaintiffs include a trust, which owns 90% of the membership interests in the company, and its trustee. The defendants include another LLC, which owns 10% of the company's membership interests and is the original managing member of the first LLC, and the managing member and 10% owner of the second LLC. The plaintiffs are suing the defendants for breaching both the first LLC's operating agreement and their fiduciary duties and are seeking a declaratory judgment that the second LLC should be removed as the managing member of the company and replaced by an affiliate of the plaintiffs. The plaintiffs also seek money damages in favor of the first LLC. Both parties requested that the other side pay their attorneys' fees under a fee-shifting provision in the operating agreement. I tried this matter for three days in February 2015. For the reasons that follow, I conclude that: (1) the plaintiffs are entitled to the declaratory judgment they seek; (2) the defendants owe the company a relatively small fraction of the money damages sought; and (3) the plaintiffs are entitled to recover one-half of their reasonable attorneys' fees.

Before delving into the myriad details relevant to this dispute, I note that it provides an important object lesson: an alternative entity, like the LLC at the center of this litigation, is not the same thing as a corporation. In particular, the 90% non-managing member of an LLC generally does not get to call the shots. By the same token, the managing member enjoys broad discretion in the management of the entity, but can be removed for cause if it fails to pay attention to the requirements of the LLC's

1

operating agreement. It is critical to the successful and mutually beneficial operation of an alternative entity that the members and their counsel not lose sight of these fundamentals.

## I. BACKGROUND[1]

### A. The Parties

The plaintiffs are the 2009 Caiola Family Trust ("CFT"), a Florida trust, and Louis Cortese, CFT's trustee. I refer to CFT and Cortese, collectively, as "Plaintiffs." CFT is the 90% owner and the Non-Managing Member of Dunes Point West Associates, LLC ("DPW" or the "Company"). Cortese's uncle, Louis Caiola, is the settlor of CFT and operated an investment banking boutique. Cortese, beginning in 1976, served as the financial manager of Caiola's businesses.

Defendant PWA, LLC ("PWA"), a Kansas limited liability company ("LLC"), owns 10% of the Company's membership interests and was its original Managing Member. Whether PWA still remains the Managing Member is the primary issue in this case. Defendant Ward Katz[2] is PWA's managing member and owns 10% of its membership interests. Katz has over thirty years of experience in developing and

---

[1] Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text. Exhibits are cited as "JX #," and facts drawn from the parties' pre-trial Joint Stipulation are cited as "JS ¶ #." Capitalized terms not defined herein have the meaning assigned to them in the Company's Amended and Restated Operating Agreement, executed as of November 28, 2006 (the "Operating Agreement").

[2] All references to "Katz" throughout this Opinion should be understood to mean Ward Katz. Any reference to Ward Katz's son, Peter Katz, will include his first and last name.

2

managing multifamily properties and is also the President and CEO of Dunes Residential Services, Inc. ("DRS"), the former Property Manager of DPW. Together, I refer to PWA and Katz as "Defendants." DPW is also a nominal defendant in this case. DPW is a Delaware LLC that was formed in 2006 to acquire, own, operate, lease, or otherwise dispose of approximately 12.67 acres of land upon which a 172-unit multifamily apartment complex, known as the Dunes at City Center, sits in Lenexa, Kansas (the "Property").

There are numerous relevant non-parties in this action. Along with PWA, NDC Point West LLC ("NDC Point West") and Block Investment Group Point West, LLC ("Block") were the Company's Members at formation. NDC Capital Partners, LLC ("NDC Capital"), an affiliate of NDC Point West and Block, was the Company's original asset manager under the Operating Agreement (the "Asset Manager") and a co-investor with Katz in another property. Curo Enterprises, LLC ("Curo Enterprises"), an affiliate of Caiola, assumed NDC Capital's role as the Asset Manager in July 2012.[3] DRS, a Texas corporation and an affiliate of Defendants, was the Company's original Property Manager under the Management Agreement between DRS and the Company, dated August 14, 2006. DRS also managed several other properties in which Katz or NDC Capital had invested. DRS resigned as the Property Manager in September 2013 and was replaced by GREP South L.P. ("Greystar"), a property manager that is not affiliated with the parties but was selected for the Company by Plaintiffs. Curo Point West, LLC

---

[3]     JS ¶¶ 49, 54.

3

("CPW"), an affiliate of Caiola, was designated by Plaintiffs to replace PWA as the Managing Member. NorthMarq Capital, Inc. ("NorthMarq") holds an $8.715 million mortgage that encumbers the Property. The Ward A. Katz Revocable Trust, the Donna Katz Revocable Trust, and DLKPWA, LLC are all entities associated with and controlled by Katz to which Katz transferred his interest in PWA in 2007 or 2008, 2011, and 2013, respectively.

## B. Facts

### 1. Katz and NDC Capital plan their investment in the Property

Katz's initial investment strategy for the Property centered on the acquisition and repositioning of the then-Point West Apartments to benefit from the City of Lenexa's planned development of the Lenexa City Center (the "City Center"). The City Center was expected to offer 4.5 million square feet of mixed-use development, including retail and office space, on 200 acres and serve as a "gathering place for shopping, recreation, and employment."[4] Katz monitored the progress of the City Center plan and attended city council meetings where it was discussed and ultimately approved.[5]

After a local broker listed the Property for sale, Katz obtained and reviewed the sales brochure and presented it to Eric Jones of NDC Capital. NDC Capital expressed an interest, and Katz developed a business plan to purchase and rehabilitate the Property to increase rents (the "Rehab Program"). As part of the repositioning effort, Katz planned

---

[4]     JX 7 at 5; JX 66 at 4-6.

[5]     Tr. 405 (Katz).

4

to rename the Property the Dunes at City Center to give it "more of an urban flavor . . . [and] brand."[6]

### 2.     DPW is formed

DPW was formed on August 9, 2006.  PWA (10%), NDC Point West (12%), and Block (78%) were the Company's Members at formation, with PWA designated as the Managing Member.  The Company purchased the Property on November 28, 2006 from Aimco Properties for $10.5 million.  The $10.5 million purchase price was financed in part by the investors' equity capital and in part by a secured, non-recourse loan from NorthMarq, totaling $8.715 million.

The Operating Agreement provides that PWA is the Managing Member, vested with "sole and exclusive control over the Company," and that all other parties are Non-Managing Members.[7]  The Non-Managing Members are not to "participate in making the decisions of the Company" or have the power to "manage or transact any Company business."[8]  According to Katz, NDC Capital's role was limited to representing and interfacing with investors: "NDC [Capital] provided, really, the capital market's [*sic*] expertise because they raised most of the equity in this case.  And they were really much more familiar with what the expectations of investors are, and that was their expertise."[9]

---

[6]     *Id*. at 412.

[7]     JX 16 [hereinafter Operating Agreement] Preamble, §§ 3.4, 6.1.

[8]     *Id*. § 3.8.

[9]     Tr. 410-11.

Consistent with these responsibilities, the Operating Agreement required PWA to provide certain financial information to NDC Capital, which NDC Capital was then to deliver to the Non-Managing Members.[10] This structure is consistent with information that Caiola acknowledged he received before investing.[11] The Company's Confidential Investment Brochure (the "Investment Brochure") stated that "Investors will be extremely limited in the management of the Company, and investors will have no right to control the affairs of the Company except as specifically provided in the [Operating Agreement]. . . . Therefore, it will be very difficult to remove [the Managing Member]."[12]

### 3. Plaintiffs invest in DPW

Caiola was introduced to the Company by NDC Capital, with whom he previously had done business. On January 18, 2007, Block transferred its membership interests to Cortese and Caiola, who transferred their interests to CFT on January 1, 2009 and April 14, 2014, respectively. In addition, on June 30, 2012, NDC Point West transferred its membership interests in the Company to CFT. By mid-2014, therefore, PWA owned 10% of DPW and CFT owned 90%.[13]

---

[10]    Operating Agreement § 7.9.

[11]    Tr. 180-83 (Caiola).

[12]    JX 10 at 23.

[13]    As a result of the above described transfers, the terms "Non-Managing Members," "Investment Members," "NDC Investors," and "NDC" in the Operating Agreement all now refer to CFT.

6

As part of their initial investment in DPW in 2007, Caiola and Cortese contributed approximately $2.5 million to the Company. A portion of Caiola's and Cortese's investment was placed into reserve accounts, including an account for the Rehab Program designed to improve the Property and increase rents (the "Rehab Reserve"). Before investing, Plaintiffs received the Investment Brochure from Defendants and NDC Capital, which projected that each Member, in the first year, would receive distributions amounting to a 7.5% annual return and projected a 10% return on investment in later years.

### 4. DPW makes distributions to the Members

Each month during the period from January 1, 2007 through September 30, 2013, Defendants and DRS prepared financial reports regarding the Property (the "Investment Updates"). The Investment Updates, which were distributed to the other Members through the Asset Manager, included an income statement, balance sheet, and monthly commentary, among other financial documents. Further, toward the end of each year, Defendants and NDC Capital distributed an annual business plan (the "Business Plans") to the Members for their approval. The Business Plans contained detailed narratives regarding DPW's operations and finances as well as a proposed budget for the upcoming year.

At the end of each quarter in 2007 and the first quarter of 2008, Defendants caused DPW to make distributions to the Members. In the aggregate, these distributions totaled $331,973, approximately $260,000 of which went to Plaintiffs. These distributions ceased in 2008. In the Investment Updates and Business Plans, PWA and NDC Capital

7

characterized these distributions as "returns on equity," "dividends," "annualized returns," and distributions from "cash flow." The Investment Updates and Business Plans also indicated that Plaintiffs were receiving a 7.5% annualized return on their investment, which matched the amount projected in the Investment Brochure. Further, through 2012, the Investment Updates continued to refer to the 2007 and 2008 distributions as "annualized returns" or "dividends."

Caiola testified that, at the time, he believed that DPW was distributing returns *on* Plaintiffs' equity rather than returns *of* their investment. DPW had not generated a profit or positive cash flow from operations, however, from which to fund those distributions. But, the Investment Updates disclosed on the first page the distributions paid to the Members and the sources of those distributions. For the quarter ending December 31, 2007, for example, the Investment Update stated that the Members were paid distributions in the amount of $62,330, while the total net income available for the distribution was negative $10,963. The update further showed that the distribution had a negative $73,293 effect on the Company's working capital.

**5.     PWA and DRS attempt to implement the Rehab Program**

After acquiring the Property in 2006, the Company commenced implementation of the Rehab Program, budgeted to cost $853,504. The Rehab Program focused on interior upgrades and certain exterior improvements, and its goal was to position the Property "to compete with apartment projects which [were] ten years less in age translating to a 10%

8

to 15% increase in rents."[14] As of June 1, 2008, the Company had completed the interior renovation of 125 out of the 172 units. NDC Capital reported to Cortese that this was "on schedule with the Business Plan."[15]

There were some cost overruns during the Rehab Program, however, and, due to the 2008 financial crisis, DPW could not achieve the projected post-rehabilitation rents for certain apartment types. Further, because DPW previously had distributed its Members' capital, the Rehab Reserve was exhausted and could not be relied on to fund the remainder of the Rehab Program.[16]

As a result, it was projected that DPW would need an additional $160,000 to complete the Rehab Program and a total of $225,000 to complete the revised Business Plan for the Property. PWA offered to contribute $175,000 and NDC offered to contribute $50,000 to cover this expense. Caiola rejected these contribution offers because he considered them to be efforts to "strip equity from the investors."[17] The parties instead agreed to a capital call for $175,000, with each Member contributing based on their percentage ownership interest. On August 25, 2008, Defendants issued the capital call to all the Members to replenish the depleted reserves, and Plaintiffs contributed 78%—equal to their percentage ownership of DPW at the time—or

---

[14]    JX 14 at 3.

[15]    JX 46 at 2.

[16]    JX 48.

[17]    Tr. 201-02.

$136,600. The Company used these funds to continue performing the Rehab Program. As of January 2011, 164 of the 172 units had been renovated.

**6.      Plaintiffs seek to take a more active role in managing the NDC Investments**

Caiola originally was introduced to the Property in late 2006 by Anthony Niosi, an executive at Citibank, N.A. who Caiola met approximately nine years earlier. Niosi also managed NDC Capital, and the Property was one of seven similarly structured real estate investments Caiola made through NDC Capital (the "NDC Investments"). During the term of his investment, Caiola received the Investment Updates and had occasional conversations with representatives of NDC Capital, but he had no contact with Katz before July 2012.[18]

From 2000 to 2009, Caiola primarily resided in Europe. While overseas, Caiola and Cortese primarily "check[ed] [the monthly Investment Updates] for occupancy and . . . read the narratives."[19] Caiola and Cortese "depended on NDC [Capital], who is the conduit to the managing member, to provide [them] with accurate information."[20]

After returning from Europe, Caiola looked to devote more of his efforts to managing his investments in the United States, including reviewing the Investment Updates in more detail. In April 2011, Caiola formed Curo Enterprises for purposes of acquiring a 40% equity interest in NDC Capital and taking a more "hands-on" approach

---

[18]      Tr. 23, 170 (Caiola).

[19]      *Id*. at 192.

[20]      *Id*.

with the NDC Investments. Curo is Latin for "cure," and Caiola thought the name "was pretty appropriate because we had some assets that need[ed] to be cured within the portfolio."[21]

After Caiola acquired a 40% equity stake in NDC Capital, he caused it to be restructured as Dome Equities ("Dome") and tried to convince Dome to take a more active role in managing the NDC Investments. Caiola left his position with Dome after only six months, but retained his equity stake. Caiola then contacted one of his advisors, Stephen Cox, and told him that "he was unhappy with his investments that he made through NDC."[22] In advising Caiola, Cox divided the investments into two categories: (1) those Caiola should sell right away; and (2) those Caiola should hold, reposition, and sell later. The latter category included DPW.

Cortese acknowledged during his deposition that Plaintiffs' "overall objective" with respect to the NDC Investments was to obtain "total control of these properties."[23] Cortese believed Plaintiffs could "better direct a more satisfactory conclusion and completion by having control."[24] Indeed, Caiola stated in an email to the operator of Fenwick Apartments Associates, L.P. ("Fenwick"), another NDC Investment, that "[f]rankly the NDC experience has convinced us to never again outsource our financial

---

[21]     Tr. 223.

[22]     Tr. 358 (Cox).

[23]     Cortese Dep. 103.

[24]     *Id.*

11

destiny to any [general partner]. Our current and future investments will only be directed to those opportunities in which we control the outcome."[25]

Defendants point to Caiola's dealings with the operator of Fenwick as illustrative of the means by which Plaintiffs sought to take control of the NDC Investments. Caiola testified that he was satisfied with the performance of Fenwick, its operator, and his equity investment.[26] Nonetheless, by November 2013, Caiola began discussing a sale of that property with the operator. In a letter dated January 15, 2014, Plaintiffs pressed the operator to either purchase Plaintiffs' interests or sell its interests to Plaintiffs, and Caiola stated that they would use "whatever means necessary" to effectuate a consolidation of the partnership interests, including removing the operator as Fenwick's general partner.[27] Ultimately, on January 31, 2014, the parties signed a Purchase and Sale Agreement by which the operator agreed to purchase Plaintiffs' interests in Fenwick. As Defendants emphasize, the DPW Property is the only one of Plaintiffs' seven NDC Investments for which Plaintiffs, to this point, have been unsuccessful in either gaining full control or selling their interest.[28]

---

[25] JX 223.

[26] Tr. 232.

[27] JX 219, 223.

[28] Tr. 231-32 (Caiola).

12

**7.      Plaintiffs become more closely involved with DPW and suspect Defendants are mismanaging the Company**

In 2012, as Caiola negotiated his purchase of NDC Point West's 12% membership interest and explored his desired replacement of NDC Capital as the Asset Manager, he inquired more closely about PWA's financial reporting.  As a result of his increased scrutiny, Caiola began to suspect that, in addition to making distributions to Members that were returns of capital rather than returns on investment, as described above: (1) Defendants repeatedly had misstated the Company's finances; (2) Defendants had paid Asset Management Fees to NDC Capital in violation of the Operating Agreement; and (3) DPW was incurring unreasonable expenses.

**a.      Plaintiffs suspect Defendants are misstating the Company's finances**

Plaintiffs' experts prepared a report identifying a number of inconsistencies and errors in DPW's financial records and alleged that the financial statements in the Investment Updates were not compliant with Generally Accepted Accounting Principles ("GAAP").  For example, the Company's balance sheets and accounts receivable aging reports were inconsistent, as the balance sheets reflected a greater amount of accounts receivable than the aging reports did.[29]  As a result, the assets on the balance sheets may have been inflated because they included receivables that may have been either uncollectible or nonexistent.  Elisa Edwards, a DRS employee, acknowledged in an email to Cortese dated November 12, 2012 that the accounts receivable balance on the balance

---

[29]      JX 280.

sheet did not agree with the aging reports because unpaid rents "ha[d] not yet been written off."[30]

Defendants also may have overstated net cash flows and liabilities by failing to report DPW's mortgage principal payments and, correspondingly, to reduce DPW's mortgage principal amount between 2010 and 2012.[31]

In addition, despite the fact that DPW never segregated security deposits from other funds, the balance sheets indicated that those deposits were held in a separate "security deposit account." The April 2010 balance sheet specifically lists a separate line item for "Cash – Security Deposit Account" in the amount of $30,682.[32] Jerry Gottlieb, Defendants' expert witness and DPW's accountant, admitted that this line item was an error. Gottlieb also admitted that when a company does not segregate tenant deposits, "[i]f you showed a security deposit account with an amount of money, that would be pulling the wool over the eyes of an investor or a reader of the financial statements."[33]

### b.    Plaintiffs suspect Defendants paid management fees to NDC Capital in violation of the Operating Agreement

NDC Capital was entitled, as the Asset Manager, to receive asset management fees under Section 8.3(c) of the Operating Agreement ("Asset Management Fees") for its

---

[30]    *Id.*

[31]    JX 280.

[32]    JX 62.

[33]    Gottlieb Dep. 90.

services. Those services included providing DPW's financial reporting and overseeing PWA's management of DPW.

NDC Capital was to receive $6,563 in Asset Management Fees each quarter, but only to the extent of the Company's Net Cash Flow from Operations ("NCFO") after the payment of all of the Company's liabilities. If there was insufficient NCFO, the Asset Management Fees were to accrue and be paid either: (1) when the Company had sufficient NCFO to pay the fees; or (2) upon the sale of the Property or a refinancing.[34] From the time DPW was formed until mid-2012, when NDC Capital was replaced as the Asset Manager, PWA paid the Asset Management Fees each quarter, totaling $146,755.[35] As demonstrated by Edward Dratch, Plaintiffs' accounting expert, however, DPW never had sufficient NCFO to support payment of these Asset Management Fees.

There was some dispute at trial as to how Defendants decided whether to pay the Asset Management Fees. Katz testified that "at the end of a quarter, [he] would make a determination as to whether the asset management fee was payable [to NDC Capital]" and that he made these calculations "in his mind."[36] Edwards, on the other hand, stated that the payments to NDC Capital were made automatically and were "a given."[37] And, as Katz himself admitted, if he determined there was negative cash flow in a particular

---

[34]    Operating Agreement § 8.3(c).

[35]    JX 280.

[36]    Tr. 439.

[37]    Edwards Dep. 34.

15

quarter, he still would pay the Asset Management Fees from DPW's reserve accounts, including the Rehab Reserve.[38]

On July 1, 2012, Curo Enterprises replaced NDC Capital as the Asset Manager, and on July 23, it demanded that PWA reimburse DPW for the Asset Management Fees paid to NDC Capital. PWA refused to reimburse those fees. In addition, at the end of the next quarter, PWA sent Curo Enterprises the same quarterly fee it had been paying NDC Capital. Curo Enterprises, however, refused to accept that payment.

c.      **Plaintiffs suspect DPW is incurring unreasonable expenses**

Defendants' financial statements show that from January 2007 through September 2013, DPW's total revenue was $9,396,215.[39] Under the Management Agreement, DRS was entitled to 4% of that amount in Property Management Fees,[40] which Plaintiffs calculated to be $384,366. During that same period, however, DPW paid DRS $1,945,766, which included both the Property Management Fees and expense reimbursements.[41] In addition, overall expenses, including payroll, increased over DRS's term as Property Manager. According to Plaintiffs' real estate expert, Alan Feldman, as compared to 2006—*i.e.*, when the Property was under the prior owner's management—

---

[38]      Tr. 439.

[39]      JX 280.

[40]      Operating Agreement Ex. D [hereinafter Management Agreement] § 5.

[41]      JX 280.

16

the Property's average annual operating expenses under DRS's management were 31% higher.[42]

Some of the payments to DRS were necessary to operate the Property: because all of the Property's employees worked directly for DRS rather than DPW, DRS allocated employee expenses among all the properties it managed. Plaintiffs dispute the validity of other payments, as well. For instance, DRS charged the Company for auto and excess liability insurance coverage. DPW also allocated all the health and medical insurance costs for all DRS employees to DPW, including part-time employees, without regard to the amount of time they spent at other DRS properties. In total, Plaintiffs' experts concluded that DRS allocated $88,724 of expenses to the Company without appropriate back up or authority under the Management Agreement.[43]

Defendants attribute the increase in DPW's operating expenses to the costs associated with the Rehab Program and their replacement of the Property's administrative staff. As described in the Company's 2008 Business Plan, PWA expected a 4.67% increase in total payroll expense to complete the Rehab Program in an "efficient manner." PWA reported that it had "replaced the entire administrative staff with a more enthusiastic and upbeat leasing professional as well as a more customer oriented property manager, which both required additional compensation than the original staff."[44] PWA

---

[42]    JX 279 at 10.

[43]    *Id.*

[44]    JX 34.

17

also hired a "groundskeeper/make-ready person for April through October rather than contracting this work out."[45]   And, according to Joy Peters, Defendants' property management expert, the Property was staffed appropriately.[46]

### 8.    DRS is replaced by Greystar as the Property Manager

Caiola and Cox first met Katz in mid-July 2012 at the Property.  Before that meeting, Plaintiffs had decided, without viewing the Property, that DRS needed to be replaced.[47]  At the July 2012 meeting, Caiola and Cox demanded that PWA replace DRS. Katz "vehemently disagreed" with their claim that DRS had not performed properly and refused to replace DRS as the Property Manager.[48]  Shortly thereafter, Plaintiffs' counsel sent a letter to Defendants purporting to remove DRS.[49]

Plaintiffs, using a strategy similar to what they used to gain control of the other NDC Investments, sought to compel Katz's compliance with their requests.  For instance, on August 2, 2012, Plaintiffs formed CPW to replace PWA as the Managing Member. Cox sent an email dated October 16, 2012 and a letter dated February 4, 2013 to NorthMarq criticizing PWA and DRS's performance in managing the Property.[50]  When

---

[45]    *Id.*

[46]    Tr. 758-59.

[47]    Tr. 170-71 (Caiola).

[48]    Tr. 364 (Cox).

[49]    JX 92.

[50]    JX 117, 158.

PWA refused to replace DRS as the Property Manager, Plaintiffs purported to remove PWA as the Managing Member and filed this action to validate that removal on November 13, 2012.

Cortese also began sending emails to PWA questioning various items in the Company's financial reports. PWA responded to those emails, but Plaintiffs considered the responses unsatisfactory. On October 29, 2012, Cortese told Katz that he "must take action and remove DRS in favor of Greystar."[51] Around the same time, Plaintiffs refused to approve the 2013 Business Plan, which included the budget for that year. Without an approved budget, PWA's ability to perform repairs and maintenance at the Property was restricted because DRS was "limited to basically following the budget from the previous year as far as capital expenses."[52]

On February 22, 2013, Curo Enterprises notified Katz that it was terminating the Management Agreement. Katz disputed Curo Enterprises's right to terminate that agreement unilaterally, and DRS refused to step down as the Property Manager. In March 2013, Curo Enterprises filed an action against DRS in Kansas state court seeking a declaration that it had the right, as the Asset Manager, to terminate the Management Agreement with DRS and replace it with a new Property Manager (the "Kansas Action"). On September 7, 2013, just before the trial of the Kansas Action was set to begin, DRS resigned as the Property Manager.

---

[51]    JX 123.

[52]    Pence Dep. 36. Elizabeth Pence is a DRS employee.

19

On September 17, 2013, NorthMarq approved Curo Enterprises's application to appoint Greystar as the new Property Manager. In addition, on September 26, the Kansas court entered an order directing the parties to effect the transition from DRS to Greystar. Beginning October 1, 2013, Katz, on behalf of DRS, referred all Property Manager-related inquiries to Greystar. Greystar and CPW, acting on DPW's behalf, entered into a new management agreement dated September 30, 2013. Curo Enterprises then asserted that, because it had prevailed in the Kansas Action, it was entitled to reimbursement from DRS of its legal fees in that action under the Management Agreement. PWA disputed that proposition. The trial court in the Kansas Action denied Curo Enterprises's application for fees, but on January 2, 2015, the Kansas Court of Appeals agreed with Curo Enterprises and reversed.[53] DRS reportedly has appealed that decision.

Greystar took over as the Property Manager on October 1, 2013. According to Vicki Hutchens, Greystar's property manager, the Property was in bad shape: "concrete was in severe disrepair"; many of the handrails in the common areas "had a lot of rust and were compromised"; and there were "a lot of dead limbs, . . . which seemed kind of hazardous."[54] In addition, Hutchens testified that "[t]he property was not in maintained condition," "a lot of [the angle irons supporting stairs] [were] rusted and in disrepair . . . [a]nd some of them were loose"; there was erosion that "was so bad that we had a mudslide approaching the building [and p]eople couldn't even get to their front door

---

[53]     JX 278.

[54]     Hutchens Dep. 16-17.

20

without stepping in mud"; and "there was extensive damage" from wood rot.[55] In 2013, DPW received a city fire-code violation, under DRS's management, regarding the wrought-iron steelwork on the stair treads. In 2014, before repairs could be made, a resident fell through a step and suffered injuries when a rusted angle iron supporting the step gave way.

Greystar conducted a comprehensive inspection of the Property when it took over. It identified approximately $10,000 in "life safety" repairs, $400,000 in "required" repairs, and $200,000 in "recommended" repairs. Many of the "required" repairs included the types of repairs Katz previously had deemed "Emergency Expenditures" under the Operating Agreement. For example, on July 22, 2013, Katz informed Plaintiffs that he had to spend "$5,414 to replace stair treads and railings" and "$8,300 to make concrete repairs" as Emergency Expenditures.

Despite the conditions giving rise to these Emergency Expenditures and the "required" and "recommended" repairs identified by Greystar, PWA budgeted and spent little for safety and repair expenditures before 2013. From 2010 to 2012, PWA budgeted and spent nothing on sidewalk and wood rot repairs. In 2010 and 2011, PWA budgeted $0 and $100, and spent $86 and $0, respectively, for parking lot asphalt repairs. In 2012, PWA budgeted $7,125 for total repairs and $33,378 for total capital expenditures. PWA submitted a proposed 2013 Business Plan with significantly more money budgeted for repairs and capital expenditures—$75,307 and $66,680, respectively—but Plaintiffs

---

[55] *Id*. at 26, 49, 134.

21

rejected that plan, forcing PWA to operate from the 2012 budget. Because PWA had not completed the repairs for the Emergency Expenditures it had identified, Greystar flagged those same items, among other things, as "required" and "recommended" repairs once it took over as Property Manager on October 1, 2013.

Annually, NorthMarq sent an inspector to the Property for a routine property inspection and issued a letter reporting the results of that inspection. On November 21, 2013, soon after Greystar took over as the Property Manager, Hutchens accompanied NorthMarq's inspector during its annual inspection. The inspector identified multiple repairs and discussed those with Hutchens. On December 9, 2013, NorthMarq sent a letter to CPW seeking an update on the progress of those identified repairs. That letter identified the repairs that "need[ed] to be addressed."[56] Some of those items also had been identified in NorthMarq's 2012 inspection, but had not been addressed because, as PWA acknowledged in its 2012 Business Plan, DPW lacked the necessary "surplus cash."[57]

### 9. Katz steps away from DPW's operations

Katz conceded at trial that since DRS resigned as Property manager in September 2013, he has not "been actively involved in managing" DPW.[58] David Antebi, the non-managing member of PWA, sent Caiola emails on October 3 and 8, 2013 stating that

---

[56] JX 200.

[57] JX 74 at 11.

[58] Tr. 507-08. Katz further admitted that his son, Peter Katz, has not been involved with the Property since 2007. *Id.* at 513-14.

22

Katz "is out of the picture" and "resign[ed] from all activities at PWA."[59] Katz explained that he has not done anything to oversee Greystar since October 2013 because DRS is no longer the Property Manager. Katz did not respond to NorthMarq's requests for repairs in its December 2013 inspection report and has not paid DPW's mortgage payments or overseen the Property's insurance. Moreover, when DPW's tax return was due on September 15, 2013, Katz refused to sign the return.[60] Cox signed the 2013 tax return in Katz's place and CPW caused it to be filed. Cox also testified that, after October 1, 2013, he, rather than Katz, has been involved in every facet of DPW's management and the Property's operations, including working with Greystar to prepare the financial reports, dealing with insurance claims, overseeing repair work, and interfacing with NorthMarq in all respects.[61]

Katz testified, however, that he "visit[s] the [P]roperty several times a month" and has visited Hutchens "at least three times . . . since 2013."[62] Through those meetings and visits, as well as by reading the monthly operating reports, Katz claims he kept abreast of the developments at the Property. Hutchens corroborated Katz's testimony, testifying that she and Katz met multiple times to discuss the progress of the Rehab Program and that they once walked through the Property. She also indicated that Katz "appeared to

---

[59]     JX 184.

[60]     Tr. 119-20 (Caiola).

[61]     Tr. 309.

[62]     Tr. 502.

have an investor or someone that wanted to see the community" with him when he visited.[63]  Hutchens further acknowledged being in contact with two other DRS employees, Pence and Gina Johnson, more frequently to ask for assistance with resolving various issues that arose in the management of the Property.[64]

### 10.  Plaintiffs issue two capital calls

When Greystar assumed the Property Manager's responsibilities, it notified Plaintiffs that DPW lacked cash.  Gottlieb acknowledged that DPW's working capital was negative from 2010 through 2013 and that it had shrunk to approximately negative $45,000 by November 2013.  Indeed, according to Greystar, the Company was in danger of defaulting on its debts.  In addition, Greystar notified Curo Enterprises that it had written off nearly $21,000 of tenant receivables from the Company's September 30, 2013 balance sheet as uncollectible bad debts, thereby further increasing the working capital deficit.

In a December 11, 2013 Asset Management Report (the "Asset Management Report"), Cortese wrote that "Curo [Enterprises] is in discussion with management to consider re-introducing the property (once approved capital improvements are complete) to the market with a name change (The Pointe at City [C]enter) revision of all marketing materials and signage."[65]  The Asset Management Report also listed a number of

---

[63]     Hutchens Dep. 95.

[64]     *Id*. at 125-26.

[65]     JX 206.

24

improvements as recommended for repositioning and reintroducing the Property. These improvements appear to coincide with what Greystar identified as life safety, required, and recommended repairs in its earlier assessment.

PWA's practice was to rely on security deposits to fund operations, and it commingled those funds with operating cash. Because the tenant turnover rate was 60 to 70% per year, it appears that DPW repeatedly was required to return security deposits throughout the year. Nevertheless, there is no evidence that DPW had any history of not refunding security deposits when such payments were due.

Greystar took a different approach; it established a segregated account of $46,105 for security deposits and funded the deposits on its own with Plaintiffs' support. On November 14, 2013, Amy Stephens, the accounting manager at Greystar, emailed Cortese and Cox, stating: "I am not positive the property will cash flow enough to cover its bills over time . . . I think it makes sense for a capital contribution to occur to fund the security deposit liability in order for the property [*sic*] pay its vendors in a timely manner."[66] CFT then delivered to the Members, on November 25, 2013, a Notice of Additional Capital Contribution (the "First Capital Call Notice") under Section 4.3 of the Operating Agreement.[67]

The First Capital Call Notice sought total contributions of $190,000 (the "First Capital Call") for the explicit purposes of: (1) replenishing $46,105 to fund DPW's

[66]    JX 191.

[67]    JX 192.

25

liability for security deposits; (2) funding $103,895 to balance the Company's negative working capital to make payments to vendors and ensure compliance with the Mortgage's obligations to pay operating expenses and insurance premiums; and (3) paying $40,000 for concrete and railing repairs. Plaintiffs contributed their proportionate share of the First Capital Call—$171,000—but PWA opposed the Capital Call and refused to contribute its share—$19,000. On December 6, 2013, CFT notified PWA that it had funded both its and PWA's shares of the First Capital Call.[68]

Hutchens oversaw the repairs at the Property and, on January 6, 2014, delivered a report to Cox so that he could update NorthMarq on the status of those repairs. During the winter of 2014, the Property suffered additional damage when exposed pipes ruptured and flooded several apartments. On January 6, 2014, a fire destroyed two apartments. CPW handled the claims process with DPW's insurer. A deductible payment of $25,000 and additional funds were required to address those issues.

By July 2014, CFT claimed that additional capital was needed to finish the ongoing repairs. As a result, on July 31, 2014, CFT delivered to the Members a second Notice of Additional Capital Contribution (the "Second Capital Call Notice") under Section 4.3 of the Operating Agreement. The Second Capital Call Notice sought contributions of $158,052 (the "Second Capital Call") to: (1) fund partially $256,423 to repair damaged or deteriorated concrete sidewalks, stoops and pads, breezeways, curbs, asphalt and seal coating, siding and wood rot, filing metal stair rails, landscape erosion,

---

[68] JX 199.

26

and flood damages, as well as subfloor repairs; and (2) fund $67,629 to balance the Company's negative working capital to make payments to vendors and ensure compliance with the Mortgage's obligations to pay operating expenses and insurance premiums. Once again, Plaintiffs contributed both their proportionate share of the Second Capital Call—$142,246.80—and PWA's—$15,805.20—after PWA refused to participate. On August 14, 2014, CFT notified PWA that CFT had funded the entire Second Capital Call. CFT also purported to convert its contributions under both Capital Calls into Deficit Loans under Section 4.4 of the Operating Agreement and deemed PWA a Forfeiting Member.

### 11. Katz attempts to sell the Property

Since DRS's removal as the Property Manager, Katz twice has attempted to secure proposed buyers for the Property. The first was ELKCO Properties, Inc. ("ELKCO"), which Katz identified in connection with his effort to exercise the Buy-Sell provision of the Operating Agreement[69] on July 9, 2014. ELKCO made an offer of $10,655,402, which was structured to avoid a pre-payment penalty under the Mortgage. A sale at that price would have resulted in CFT receiving $2,271,950 and PWA $252,439.

ELKCO then asked Caiola to provide a good faith price for the purchase of CFT's interest. Caiola submitted a price based on a valuation of the Property at $12,933,720. This would have netted CFT $4,325,486, but nothing to PWA unless ELKCO accepted CFT's counter and agreed to pay PWA a proportionate amount. ELKCO then made a

---

[69]     Operating Agreement § 15.1.

further offer of $11,200,000, which would have netted CFT $2,797,066 and PWA $310,785. Caiola neither accepted nor countered this offer.

After the ELKCO deal fell through, Katz continued to market the Property. In May 2015, the Mandel Group ("Mandel") issued a Letter of Intent offering to purchase the Property for $13,500,000, free and clear of the Mortgage. After accounting for an estimated $600,000 Mortgage prepayment penalty, the sale would have netted CFT $4,419,482 and PWA $481,615. Plaintiffs rejected Mandel's offer.

## C. Procedural History

This case has an extensive and relatively complex procedural history. Plaintiffs filed their original complaint against PWA on November 13, 2012. The action then was removed to the United States District Court for the District of Delaware and then later remanded back to this Court in July 2013. I entered a status quo order on August 28, 2013 to keep PWA in place as the Managing Member and to prevent the consummation of a sale of the Property.

In November 2013, both sides moved for summary judgment on the proper interpretation of Section 8.4 of the Operating Agreement. Plaintiffs interpreted that section as authorizing them to call for and execute a vote of the Non-Managing Members for the purpose of removing DRS as the Property Manager. I held argument on those cross-motions, as well as Plaintiffs' motion to amend their Complaint to add Katz as a Defendant, on January 10, 2014. At argument, I granted Plaintiffs' motion to amend. By Memorandum Opinion dated April 30, 2014, I granted summary judgment in favor of Defendants' interpretation of Section 8.4, finding that it unambiguously does not provide

28

the Non-Managing Members with the affirmative power to mandate significant actions by the Company. Instead, that Section gives the Non-Managing Members a negative right to veto such actions under certain circumstances.[70] Plaintiffs filed an amended complaint on January 13, 2014 (the "Complaint") adding, among other things, Katz as a Defendant.

I presided over a trial of this matter from February 17 to February 19, 2015. The parties filed their post-trial briefs in May and June 2015. On August 4, 2015, after Defendants had taken preliminary steps toward another sale of the Property, Plaintiffs moved to enforce the status quo order and for a temporary restraining order or a preliminary injunction blocking the sale and filed a motion to expedite proceedings. I heard argument on those motions on August 28, 2015 and issued an oral ruling denying them in part and granting them in part. In summary, that ruling: (1) effectively granted Plaintiffs' motion to expedite; (2) denied the motion to enforce the status quo order and for a temporary restraining order or a preliminary injunction as they related to the preliminary actions Defendants had taken to prepare for the possible sale of the Property; and (3) granted that motion as to Plaintiffs' request for a stay of the thirty-day period during which Plaintiffs have the option to purchase Defendants' membership interest, but only to the extent that Plaintiffs shall have fifteen days from the date of my post-trial opinion to exercise that option.

---

[70] *See 2009 Caiola Family Trust v. PWA, LLC*, 2014 WL 1813174 (Del. Ch. Apr. 30, 2014).

This Memorandum Opinion reflects my post-trial findings of fact and conclusions of law in this matter.

## D. Parties' Contentions

Four main issues were raised at trial: (1) whether Plaintiffs may remove PWA as the Managing Member under the Operating Agreement; (2) whether the alleged breaches of the Operating Agreement that Plaintiffs argue warrant PWA's removal based upon its breaches of the Operating Agreement also establish a basis to award DPW money damages against PWA; (3) whether those same facts also show a breach of Katz's fiduciary duties owed to DPW and, if so, whether DPW is entitled to money damages against Katz as well; and (4) whether either party is entitled to attorneys' fees from the other party.[71]

Plaintiffs contend that the first three issues should be resolved in their favor on two main bases. First, Defendants committed a number of acts that constitute either an Egregious Act or an Impermissible Act, as defined in the Operating Agreement. In either case, such Acts constitute grounds on which Plaintiffs can remove PWA as the Managing Member and DPW can obtain damages from Defendants. Second, PWA improperly

---

[71] In pursuing their allegations, Plaintiffs rely on two sections of the Delaware Limited Liability Company Act. The first, Section 18-110, authorizes a member of an LLC to test the validity of a purported removal of the LLC's manager, among other things. *See* 6 *Del. C.* § 18-110. The second, Section 18-111, authorizes a member of an LLC to have the Court of Chancery interpret, apply, or enforce provisions of the LLC's operating agreement on the LLC's behalf. *See* 6 *Del. C.* § 18-111.

30

failed to participate in the First and Second Capital Calls, creating additional grounds for its removal as the Managing Member.

Defendants assert, however, that each of Plaintiffs' claims is fatally flawed because Plaintiffs either have failed to prove them at trial or they are barred by laches. In addition, Defendants contend that the Complaint fails to plead a number of the bases under which Plaintiffs argued at trial that they were entitled to relief. Defendants therefore seek to preclude Plaintiffs from pursuing these claims because they failed to provide adequate notice.

Regarding the fourth issue, attorneys' fees, the Operating Agreement provides for fee-shifting in favor of the prevailing party in any action over its provisions. Because both Plaintiffs and Defendants urge me to find in their favor, they both also contend that they are entitled to recover their attorneys' fees.

## II. ANALYSIS

### A. Legal Standard

"Plaintiffs have the burden of proving each element, including damages, of each of their causes of action against each Defendant by a preponderance of the evidence."[72] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true

---

[72] *OptimisCorp v. Waite*, 2015 WL 5147038, at *55 (Del. Ch. Aug. 26, 2015).

31

than not."[73]  "By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, Plaintiffs lose."[74]

> **B.      Should PWA Be Removed as the Managing Member of the Company?**

Plaintiffs advance a number of grounds on which they assert that PWA should be removed as the Managing Member of DPW.  I sort those various grounds into two categories and analyze each category separately.  First, I group together all of Plaintiffs' contentions that PWA engaged in conduct that constitutes an Egregious or Impermissible Act under Section 6.4 of the Operating Agreement.  Then, I analyze Plaintiffs' argument that PWA improperly failed to participate in the First and Second Capital Calls and, as a result, became a Forfeiting Partner under Sections 4.3 and 4.4 of the Operating Agreement.

> **1.      Egregious and Impermissible Acts under the Operating Agreement**

Under Section 6.4(a) of the Operating Agreement, "the Managing Member may be removed at any time for 'Cause' by a Majority Vote of the Non-Managing Members."[75] As the 90% Non-Managing Member, therefore, CFT may remove PWA as the Managing Member at any time, provided it has Cause.  "Cause" includes any "Egregious Act" or "Impermissible Act."  An Egregious Act is defined as:

---

[73]    *Agilent Techs., Inc. v. Kirkland,* 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (quoting *Del. Express Shuttle, Inc. v. Older,* 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)).

[74]    *OptimisCorp*, 2015 WL 5147038, at *55.

[75]    Operating Agreement § 6.4(a).

32

> [A]ny of the following committed by the Managing Member or any of its Affiliates in connection with the Company or the [Property]: (i) Willful misconduct; (ii) The breach of any fiduciary duty; (iii) Self-dealing . . . ; (iv) Fraud; (v) Intentional misappropriation of Company funds or other Company property; or (vi) Gross negligence.[76]

According to Plaintiffs, Defendants breached their fiduciary duties, thereby committing an Egregious Act, by making improper distributions to the Members and improper payments of Asset Management Fees to NDC Capital.

In addition, the Operating Agreement defines an Impermissible Act, in relevant part, as:

> [A]ny of the following: (i) . . . any transfer of any interest in the Managing Member or any of its Affiliates that is not permitted by this Agreement and is in contravention of the Loan Documents . . . ; (ii) A material breach of [the Operating] Agreement, the Management Agreement (provided the Property Manager is an Affiliate of the Managing Member) or any agreement between the Company and the Managing Member or any of its Affiliates by the Managing Member or any of its Affiliates; . . . (iv) Upon the occurrence of any default or event of default under any of the Loan Documents resulting from any action or inaction of the Managing Member or any of its Affiliates . . . ; (v) To the extent that the Loan Documents relating to the First Mortgage Loan contain provisions limiting the recourse to the property securing the First Mortgage Loan, the actions or inactions of the Managing Member or an Affiliate that give rise to the personal liability of the Company or any guarantor or indemnitor under such Loan Documents or result in the invalidation of such provisions in the Loan Documents limiting the recourse under such Loan Documents to such property; (vii) If none of the Key Persons is actively involved in the operation of the Managing Member's business . . . ;

---

[76] *Id*. § 6.4(c).

33

(viii) If none of the Key Persons is actively involved in the operation of the Property Manager's business . . . .[77]

Plaintiffs assert that Defendants breached the provisions of Section 6.4(d) and committed an Impermissible Act in at least eight different ways. The first two are: (1) under Sections 6.4(d)(i), (iv), and (v), Katz transferred his interest in PWA in violation of the Operating Agreement and the Loan Documents; and (2) under Sections 6.4(d)(vii) and (viii), Ward and Peter Katz, who are included in the definition of "Key Persons," are no longer actively involved in the operation of PWA or Greystar. The third through eighth Impermissible Acts arise under Section 6.4(d)(ii) and allegedly involve material breaches by PWA or its Affiliate DRS of the Operating Agreement, unless otherwise noted, as follows: (3) PWA abdicated its Managing Member duties; (4) DRS improperly allocated expenses to DPW in breach of the Management Agreement; (5) PWA caused DPW to make improper distributions to the Members; (6) PWA improperly paid Asset Management Fees to NDC Capital; (7) DRS refused to relinquish its role as Property Manager as requested by Curo Enterprises in breach of the Management Agreement; and (8) PWA maintained inaccurate and inconsistent financial records.[78]

---

[77]  *Id*. § 6.4(d).

[78]  Although Plaintiffs mention Defendants' fiduciary duties in general terms in their briefs, they make no effort to identify the scope of PWA's duties, whether default or contractual, or its alleged breaches thereof. Plaintiffs generally refer to fiduciary duties more in terms of Defendant Katz. I address that aspect of Plaintiffs' claim in Section II.B.1.d.iv *infra*.

In the case of PWA, regarding the specific actions that Plaintiffs allege constitute Impermissible Acts, it appears that Plaintiffs consider those to be contractual

34

I address each of these specific arguments, as well as Defendants' responses thereto, *infra*. As an initial matter, however, I discuss Defendants' contention that Plaintiffs failed to follow the procedures governing removal of a Managing Member for Cause in Section 6.4 of the Operating Agreement as to the first, second, third, fourth, and fifth grounds enumerated above.

**a. Plaintiffs' compliance with procedures required for removal of the Managing Member**

Sections 6.4(a), (e), and (f) of the Operating Agreement govern the procedures with which the Non-Managing Members must comply to remove the Managing Member for Cause. Section 6.4(a) states that there must be a majority vote of the Non-Managing Members.[79] Section 6.4(e) requires that "[w]ritten notice of the Managing Member's removal . . . shall be served upon the Managing Member" and that the "notice shall set forth the reason(s) for removal" and provides for a transition period during which the removed Managing Member may continue to transact business in the ordinary course as necessary until the replacement Managing Member takes over.[80] Section 6.4(f) gives the

---

violations of the terms of the Operating Agreement. Even assuming that PWA has unlimited default fiduciary duties of care and loyalty, Plaintiffs have not shown how the analysis would be different or pointed to a contractual expansion of PWA's duties beyond the common law fiduciary duties. Therefore, I focus only on whether PWA breached its affirmative obligations under the Operating Agreement.

[79]    Operating Agreement § 6.4(a).

[80]    *Id*. § 6.4(e).

35

Managing Member thirty days to commence an action challenging the removal.[81]

Defendants concede that Plaintiffs followed the voting and notice requirements as to three of their asserted grounds for removing PWA as the Managing Member,[82] but argue that Plaintiffs failed to comply with Sections 6.4(a), (e), and (f) as to the other five grounds. Defendants, therefore, contend that Plaintiffs are barred from relying on any of those five grounds as a basis to remove PWA in this action.

Plaintiffs provided the initial notice of removal to Defendants in a letter dated November 8, 2012[83] and then initiated this action on November 13, 2012. Because the Complaint sought a declaratory judgment as to the validity of Plaintiffs' removal of PWA as the Managing Member, the requirement in Section 6.4(f) that PWA bring an action within thirty days of receipt of the removal notice was mooted, as its defense of this case serves as such an action. Similarly, although Plaintiffs raised additional grounds for PWA's removal after delivering the removal notice, I conclude for the reasons stated

---

[81]   *Id.* § 6.4(f).

[82]   *See* JX 127 ("[CFT and Cortese voted to] remove[] PWA for 'Cause' under Sections 6.4(c) and (d) of the Operating Agreement by reason of PWA's failure to carry out and implement the decision duly voted on and approved by [CFT and Cortese] to replace the existing property manager of the Company, and by reason of PWA's willful misconduct, breaches of the Operating Agreement and breaches of its fiduciary duties by improperly distributing Company funds to the asset manager, distributing inaccurate financial and operational reports . . . , and refusing to replace its affiliate as property manager.").

[83]   *Id*.

below that they were not required to deliver an additional removal notice to Defendants to pursue those grounds.

Plaintiffs only sought to remove PWA as the Managing Member once. As Section 6.4(f) states, "[i]f the court in any Action finally determines that the Removal Notice delivered to the Managing Member was not valid because one of the events constituting Cause has not occurred, then the Managing Member that was removed shall be reinstated as the Managing Member under this Agreement."[84] This appears to contemplate a system whereby the Managing Member is "removed" upon the receipt of a removal notice and reinstated only upon the conclusion of the relevant action. Because this action still was pending when Plaintiffs raised the additional grounds for PWA's removal—and, thus, PWA was still "removed" under the Operating Agreement—requiring a second vote by the Non-Managing Members and delivery of an additional removal notice simply would elevate form over substance. And, to the extent the removal notice requirement of Section 6.4 was intended to protect the Managing Member and preserve its ability to seek judicial determination of the validity of the Non-Managing Members' purported removal, that purpose is being served by this action. As a result, I consider Plaintiffs' additional grounds for PWA's removal essentially to have been added by amendment to the initial removal notice dated November 8, 2012 and reject Defendants' suggestion that they would have to deliver an additional removal notice including those five grounds to have them considered.

---

[84]     Operating Agreement § 6.4(f).

### b. Katz's transfers of his interest in PWA

Plaintiffs argue that Katz's transfers of his interest in PWA to the Ward A. Katz Revocable Trust, the Donna Katz Revocable Trust, and DLKPWA, LLC in 2007 or 2008, 2011, and 2013, respectively, were made without Plaintiffs' or NorthMarq's consent. Section 10.4 of the Operating Agreement and Sections 21(e)(iv)(B) and 21(e)(viii) of the Mortgage appear to prohibit the transfer of an interest in the Managing Member[85] and provide that such a transfer constitutes an Event of Default under the Mortgage.[86] And, because Katz's transfers allegedly triggered an Event of Default under the Mortgage, Plaintiffs contend that Section 9(f)(ii) of the Note underlying the Mortgage invalidates the provisions of the Note that limit NorthMarq's recourse to the Property.[87] Thus, Plaintiffs argue that Defendants committed Impermissible Acts under Sections 6.4(d)(i), (iv), and (v) of the Operating Agreement and that Cause therefore exists to remove PWA as the Managing Member.

---

[85] *Id*. § 10.4(a) ("The Managing Member shall not . . . approve or consent to, or permit or acquiesce in, any Transfer of any beneficial interest in the Managing Member other than as permitted by this Agreement.").

[86] JX 1 [hereinafter Mortgage] §§ 21(e)(iv)(B), 21(e)(viii) ("The occurrence of any of the following Transfers shall constitute an Event of Default under this Instrument: . . . (iv) . . . (B) a Transfer of any membership or other interest of a manager in Borrower that results in a change of manager . . . (viii) a transfer of any interest in a Controlling Entity which, if such Controlling Entity were Borrower, would result in an event of Default . . . .").

[87] JX 4 [hereinafter Note] § 9(f)(ii) ("Borrower shall become personally liable to Lender for the repayment of all of the Indebtedness upon the occurrence of any of the following Events of Default: . . . (ii) a Transfer . . . that is an Event of Default under Section 21 of the [Mortgage] . . . .").

Defendants admit that Katz has made more than one transfer of his interest in PWA to entities he controls, but deny that Plaintiffs have demonstrated that these transfers constitute grounds for PWA's removal as the Managing Member. Under Section 6.4(d)(i), PWA was entitled to thirty days notice that Katz's transfers violated the Operating Agreement and the Mortgage, as well as an opportunity to cure those violations.[88] Such notice was provided to Defendants on February 11, 2015,[89] and Defendants cured the alleged violation by causing the 10% interest in PWA to be transferred back to Katz on March 2, 2015. As a result, I find that neither Defendant committed an Impermissible Act under Section 6.4(d)(i).

Defendants also argue that Sections 6.4(d)(iv) and (v) of the Operating Agreement were not triggered because Katz's transfers constituted "Preapproved Transfers." Under Section 21(c)(vii) of the Mortgage, certain transfers constitute Preapproved Transfers, the execution of which do not constitute an Event of Default under the Mortgage or the Note.[90] Because Preapproved Transfers include "a sale or transfer to an entity owned and controlled by the transferor or the transferor's immediate family members," and because the Ward A. Katz Revocable Trust, the Donna Katz Revocable Trust, and DLKPWA, LLC were all controlled by Katz or his immediate family members, Defendants contend that Katz's transfers did not constitute Events of Default. As Plaintiffs point out,

---

[88]    Operating Agreement § 6.4(d)(i).

[89]    Trans. Aff. of Thomas E. Hanson, Ex. 9.

[90]    Mortgage § 21(c).

39

however, Exhibit B to the Mortgage modifies that document by deleting Section 21(c)(vii) from it in its entirety.[91] Defendants' reliance on that provision, therefore, is unfounded.

Defendants also argue that both Sections 21(e)(iv) and (e)(viii) of the Mortgage require a transfer that results in a change of DPW's or PWA's manager for an Event of Default to occur[92] and that none of Katz's transfers had that effect. Although Plaintiffs cannot show definitively that a change of DPW's Managing Member occurred, as that is the subject of this action, they assert that a change in PWA's manager occurred, citing to Section 5.2 of PWA's operating agreement. That provision states that "[Katz] shall serve as Manager until such time as [Katz] transfers his entire interest in [PWA] or resigns his position as Manager."[93] Because Katz initially transferred his interest in PWA in 2007 or 2008, Plaintiffs claim, his tenure as PWA's manager ended and an Event of Default occurred under the Mortgage.

The final sentence of Section 5.2 of PWA's operating agreement, however, states that upon Katz's term as manager ending, "a Majority in Interest shall elect a successor Manager."[94] Plaintiffs failed to demonstrate that a different manager succeeded Katz. Because Katz initially transferred his interest in PWA in 2007 or 2008, Section 5.2 of

---

[91] *Id.* Ex. B §1.

[92] *Id.* §§ 21(e)(iv)(B), 21(e)(viii).

[93] JX 5 § 5.2.

[94] *Id.*

40

PWA's operating agreement, if triggered at all, was triggered at that point. The record indicates, however, that Katz continued acting as PWA's manager for years after that, and Plaintiffs, in arguing that Katz eventually abandoned his position with PWA in 2013, do not claim differently. Although Katz transferred his interest in PWA, it appears that he continued to act as its manager and, consequently, that no "change" in DPW's or PWA's manager accompanied that transfer. Thus, I conclude that no Event of Default occurred under the Mortgage or the Note and no Impermissible Act occurred under the Operating Agreement as a result of Katz's transfers of his interest in PWA.

c. **Ward and Peter Katz's participation in PWA and Greystar's businesses**

Sections 6.4(d)(vii) and (viii) of the Operating Agreement state that the failures of the Key Persons to be "actively involved in the operation of the Managing Member's business" or "the Property Manager's business," respectively, constitute Impermissible Acts.[95] "Key Persons" is defined to include only Ward and Peter Katz.[96] Plaintiffs claim that Ward and Peter Katz were not actively involved in the operation of either PWA or Greystar, after October 1, 2013. As to Peter Katz, Defendants conceded at trial that he has not been involved with the Property at all since 2007.[97] Thus, the crux of this dispute centers on Ward Katz's involvement in the operations of PWA and Greystar during the relevant period.

---

[95] Operating Agreement §§ 6.4(d)(vii), 6.4(d)(viii).

[96] *Id.* Ex. B.

[97] Tr. 513-14 (Katz).

41

### i. Katz's involvement in the Property Manager's business

Regarding Katz's involvement in the business of the Property Manager, the parties agree that he was actively involved in DRS's business when it served as the Property Manager. Accepting that as true, however, does not preclude the possibility of an Impermissible Act under the Operating Agreement. Although "[t]he Managing Member or an Affiliate thereof"—*i.e.*, DRS—is defined initially as the "Property Manager,"[98] the expanded definition also includes "any other property manager approved pursuant to the provisions of [the Operating Agreement],"[99] which would encompass Greystar.

Plaintiffs claim that when Greystar replaced DRS as the Property Manager on October 1, 2013, Katz ceased his active involvement in the operation of the Property Manager's business. To support this argument, Plaintiffs point to Katz's admission at trial that he has "not done anything to oversee Greystar."[100] Defendants counter by arguing that Katz's and Hutchens's testimony that they met together two or three times to discuss the Rehab Program and once took a walk through the Property rebuts Plaintiffs' argument. Defendants also highlight the interactions between Greystar and other DRS staff members as evidence of Katz's continued active involvement as a Key Person in the Property Manager's business.

---

[98] Operating Agreement § 8.3(e).

[99] *Id*. Ex. B.

[100] Tr. 502.

Although the record indicates that Katz had some involvement with Greystar, the question is whether he was "actively involved in the operation of [Greystar's] business." The difficulty in answering this question lies in determining what level of involvement constitutes "active" involvement. The Operating Agreement does not define the term "actively involved." The Preamble to Greystar's management agreement with the Company describes Greystar's duties as to "manage, operate, maintain and service the [Property], and supervise the leasing and renting operations of the same . . . ."[101] Thus, active involvement includes, at a minimum, some participation in, or conscious oversight of, these day-to-day operational activities. Based on the record presented at trial, I conclude that Plaintiffs have proven by a preponderance of the evidence that Katz has not been actively involved in the operation of the Property Manager's business since Greystar supplanted DRS in October 2013.

Defendants failed to cite any persuasive evidence that indicates that Katz was involved in Greystar's management, operation, maintenance, or servicing of the Property, or that he was involved in supervising the Property's leasing and renting operations. Katz's admission that he has not done anything to oversee Greystar is damning, and the few visits he had with Hutchens do not constitute active involvement. Even if Katz and Hutchens discussed the status of the Rehab Program and took a tour of the Property, Katz's visits with Hutchens appear to have been more in the nature of a Member checking in on his investment than active involvement in the Property Manager's

[101]    JX 182 Preamble.

43

operations.  This conclusion is bolstered by Hutchens's testimony that Katz "appeared to have an investor or someone that wanted to see the community" with him.[102]  And, although two of DRS's employees may have communicated with Hutchens on a more regular basis regarding operational issues at the Property, the Operating Agreement requires that either Ward or Peter Katz—*i.e.*, one of the "Key Persons"—be actively involved in the Property Manager's business, not DRS or its employees.

Defendants also contend that the prevention doctrine[103] precludes a finding that Katz failed to satisfy the Key Person-involvement requirement.  Defendants fail to point to any evidence, however, that indicates Plaintiffs prevented Katz from being actively involved in the operation of Greystar's business.  While Defendants emphasize Plaintiffs' efforts to remove DRS as the Property Manager and PWA as the Managing Member, none of their arguments address Katz's involvement with Greystar, which appears to be an independent, third-party property management company.  Thus, as a result of Katz's failure to be actively involved in the operation of Greystar's business, I find that an Impermissible Act has occurred under Section 6.4(d)(viii) of the Operating Agreement.

---

[102]    Hutchens Dep. 95.

[103]    *See, e.g.*, *T.B. Cartmell Paint & Glass Co. v. Cartmell*, 186 A. 897, 903 (Del. Super. 1936) ("It is a sound principle that he who prevents a thing being done shall not avail himself of the non-performance he has occasioned."); *W & G Seaford Assocs., L.P. v. E. Shore Markets, Inc.*, 714 F. Supp. 1336, 1341 (D. Del. 1989) ("Delaware courts follow the principle that a party who wrongfully prevents a thing from being done cannot avail itself of the nonperformance it has occasioned.").

Plaintiff CFT, therefore, as the Non-Managing Member, did have Cause to remove PWA as the Managing Member.

### ii. Katz's involvement in the Managing Member's business

Regarding Katz's involvement in PWA's business, Plaintiffs point to evidence that they contend indicates Katz ceased his active involvement with PWA upon DRS's removal as Property Manager. Specifically, they direct my attention to October 2013 emails from PWA's non-managing member stating that Katz "is out of the picture" and "resign[ed] from all activities at PWA."[104] Notably, however, Plaintiffs have not adduced any evidence of actions taken by PWA without Katz's involvement. In fact, Katz credibly testified that he has "continue[d] to act as the [M]anaging [M]ember of PWA,"[105] and Defendants have pointed to his attempts to sell the Property as evidence thereof.

Katz's involvement with the Company and its day-to-day operations decreased when Greystar replaced DRS. But, that is to be expected, given the fact that Katz owned and managed DRS and therefore was the lead employee of the Property Manager while DRS held that post. The responsibilities of the Property Manager and the Managing Member, however, are separate and distinct from one another. Although I concluded above that Katz has not remained actively involved in the operation of the Property

---

[104]    JX 184.

[105]    Tr. 472.

45

Manager's business, whether he remained actively involved in *PWA's* business is a separate inquiry.

On this issue, I agree with Defendants and conclude that Plaintiffs have failed to prove by a preponderance of the evidence that Katz has not remained actively involved in the operation of the Managing Member, PWA's, business. PWA's sole business is the management of DPW.[106] In attempting to market the Property under the Buy-Sell Provisions in the Operating Agreement,[107] Katz was acting as the purported Managing Member of the Company. And, although Plaintiffs contend that Katz resigned from PWA in October 2013,[108] they challenged his authority in July 2014 to attempt to market the Property under the Buy-Sell Provisions because they no longer recognize PWA as the Managing Member.[109] As a result, Plaintiffs implicitly have admitted that, in his capacity as PWA's managing member, Katz was attempting, in or around July 2014, to utilize the powers allocated to the Managing Member in the Operating Agreement.

---

[106]   Operating Agreement § 3.1.

[107]   *Id*. Art. 15.

[108]   The evidence Plaintiffs rely on for this proposition consists of the emails from PWA's non-managing member described above. *See supra* note 104 and accompanying text. Having considered all of the relevant evidence, I credit Plaintiffs' evidence to the extent that it suggests that Katz reduced his time commitment to PWA in or around October 2013, but I do not find persuasive the suggestion that Katz resigned from or had no further involvement with PWA.

[109]   JX 245 ("[P]laintiffs dispute that PWA even has the right to issue a marketing notice under Section 15.1, because PWA is no longer the [M]anaging [M]ember of [DPW].").

Plaintiffs attempt to refute Defendants' argument by recasting Katz's marketing efforts as activities of the "Offering Group" under Section 15.1 of the Operating Agreement rather than the Managing Member under Section 8.1. This contention cannot be squared with the terms of the Operating Agreement. Under Section 15.1, the Offering Group is defined as either the Managing Member or the NDC Investors.[110] Plaintiffs admit that any reference in the Operating Agreement to the NDC Investors is a reference to CFT.[111] Because the Offering Group can consist of either the Managing Member or CFT, and Katz obviously was not acting for CFT, he only could have acted on behalf of PWA as the Managing Member in performing the Offering Group's activities under Section 15.1. As a result, Katz's efforts to market the Property entailed active involvement in the operation of PWA's business. Thus, I conclude that Plaintiffs have not proven that any Impermissible Act occurred under Section 6.4(d)(vii) of the Operating Agreement.

**d.** **Plaintiffs' claims that PWA materially breached the Operating Agreement**

As I described *supra*, Plaintiffs assert a number of grounds on which PWA allegedly committed an Impermissible Act under Section 6.4(d)(ii) of the Operating Agreement. Preliminarily, I note that in order for a breach of the Operating "Agreement, the Management Agreement . . . or any other agreement between the Company and the

---

[110]   Operating Agreement § 15.1 ("The Managing Member on one hand or all of the NDC Investors, based on a Majority Vote of the NDC Investors, on the other hand (in this regard, the 'Offering Group') . . . .").

[111]   Pls.' Opening Br. 7 n.1.

47

Managing Member or any of its affiliates by the Managing Member or any of its Affiliates" to constitute an Impermissible Act, that breach must be material.[112] "A 'material breach' is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract."[113] To be material, the breach "must 'go to the root' or 'essence' of the agreement between the parties, or be 'one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract.'"[114] In addition, the Restatement (Second) of Contracts identifies a number of relevant factors for "determining whether a failure to render or to offer performance is material,"[115] including:

> (a) [T]he extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and (e) the extent to which the

---

[112] Operating Agreement § 6.4(d)(ii).

[113] *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Oct. 4, 2013) (quoting *Shore Invs., Inc. v. Bhole, Inc.,* 2011 WL 5967253, at *5 (Del. Super. Nov. 28, 2011)).

[114] *Id.*

[115] RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981).

behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[116]

I next analyze each contractual breach alleged by Plaintiffs to determine whether any such breach is material under the above standard, as is required to constitute an Impermissible Act under Section 6.4(d)(ii).

### i. PWA's obligations as the Managing Member

Plaintiffs' first argument under Section 6.4(d)(ii) is that PWA breached its obligations under the Operating Agreement by "totally abdicat[ing] its role as Managing Member."[117] PWA's responsibilities under the Operating Agreement are set forth in Section 8.1, which states, in relevant part:

> The Managing Member shall devote such care, time and attention to the affairs of the Company as may be necessary in order to accomplish the performance standards set forth in an Annual Business Plan. The Managing Member shall . . . perform the following duties and obligations on behalf of the Company: (a) Use all commercially reasonable efforts . . . to maximize the amounts distributable to the Members . . . , to preserve and enhance the value of the [Property], and to protect the interests of the Members in the [Property]; (b) . . . timely pay all taxes . . . ; (c) . . . timely pay all debts . . . ; (d) . . . use all reasonable efforts to cause the Company . . . at all times to perform and comply with, and to enforce the Company's rights pursuant to, the provisions of any loan commitment . . . ; (e) . . . keep and maintain in full force and effect . . . insurance coverages . . . ; (h) Notify the Non-Managing Members promptly upon the receipt of any offer from a third party to purchase the [Property] . . . ; (j) Deliver to the Non-Managing Members all reports required pursuant

---

[116] *Id.*; *eCommerce Indus., Inc.*, 2013 WL 5621678, at *13; *Preferred Inv. Servs., Inc. v. T&H Bail Bonds, Inc.*, 2013 WL 3934992, at *11 (Del. Ch. July 24, 2013).

[117] Pls.' Opening Br. 38.

49

to [the Operating Agreement]; and (k) Make recommendations on sales and refinancings.[118]

According to Plaintiffs, PWA stopped performing its Managing Member duties under Section 8.1 in October 2013, when Greystar replaced DRS as the Property Manager. In support of their position, Plaintiffs rely on several allegations. First, regarding Sections 8.1(a) and (d), Plaintiffs assert that PWA has not interfaced with NorthMarq to ensure that all the repairs NorthMarq requested were made. Second, regarding Sections 8.1(c) and (e), Plaintiffs argue that PWA has not made DPW's mortgage payments or overseen the maintenance of the Property's insurance.[119] Third, regarding Section 8.1(b), Plaintiffs contend that Katz and PWA failed to sign DPW's 2013 tax return and cause it to be filed. Plaintiffs further aver that CPW, through Cox, has acted as the *de facto* Managing Member since October 2013, without any objection from PWA, by: (1) handling all communications with NorthMarq; (2) preparing and distributing all financial statements; (3) dealing with insurance claims and other coverage issues; and (4) signing DPW's 2013 tax return and causing it to be filed.[120]

Defendants respond by disputing Plaintiffs' claim that PWA abdicated its Managing Member duties. Specifically, Defendants argue that PWA satisfied its duty under Section 8.1(b) by causing DPW's accountant, Gottlieb, to prepare the Company's tax returns despite Curo Enterprises's and CPW's attempts to file them. In addition,

---

[118]    Operating Agreement § 8.1.

[119]    Katz Dep. 117.

[120]    Tr. 119-20 (Caiola); Tr. 309, 316 (Cox).

50

Defendants highlight Katz's efforts, on PWA's behalf, to market and sell the Property and argue that such actions constitute compliance with the Managing Member's responsibilities under Sections 8.1(a), (h), and (k). Finally, Defendants contend that PWA satisfied its Managing Member obligations by opposing Plaintiffs' Capital Calls because they allegedly failed to meet the requirements for a capital call under the Operating Agreement and "involved the depletion of the Company's operating funds through the formation of a separate account for security deposits."[121]

Even assuming that I found PWA breached its obligations under Section 8.1 of the Operating Agreement, Plaintiffs have not proven that such breaches were material. PWA's failure to perform certain actions arguably required by Section 8.1 did not defeat the "essential purpose of the [Operating Agreement] or make[] it impossible for [Plaintiffs] to perform."[122] This is largely due to the fact that, based on the record, Greystar and CPW appear willingly to have assumed, during this period of uncertainty as to the proper Managing Member, many of the responsibilities otherwise allocated to PWA in the Operating Agreement.[123]

The record does not show that PWA simply stopped performing and that, had Greystar and CPW not intervened, the activities described in Section 8.1 would have been neglected. The Court also cannot ignore the context in which these alleged breaches

---

[121]    Defs.' Answering Br. 35.

[122]    *eCommerce Indus., Inc.*, 2013 WL 5621678, at *13.

[123]    Tr. 487-88 (Katz).

occurred: the parties and their agents, including PWA and CPW, were and are in a dispute over which of those entities is the Managing Member of DPW. Greystar presumably is attempting to perform its obligations as the Property Manager, but otherwise remain neutral, although it was selected by Plaintiffs or their affiliates, who brought about the resignation of the previous Property Manager, DRS. In this context, I find that the division of labor between PWA, Greystar, and CPW evolved organically and fairly logically, with Greystar and CPW managing more of the day-to-day issues at the Property and PWA taking a higher level approach, including attempting to consummate a sale of the Property.[124] Plaintiffs, therefore, were not "deprived of the benefit which [they] reasonably expected,"[125] as the actions required under Section 8.1 were completed with PWA's assistance. Thus, Plaintiffs have failed to prove that PWA materially breached the Operating Agreement by abdicating its Managing Member duties.

### ii. DRS's reimbursements from DPW

Plaintiffs' second argument under Section 6.4(d)(ii) is that DRS, as an Affiliate of PWA, breached the Management Agreement by improperly allocating its expenses to DPW. DRS and PWA are Affiliates, as that term is defined in the Operating Agreement,

---

[124]   *Id.* ("[M]ost of the activity at PWA was really executed by DRS, in terms of managing the property, reporting, and so forth. So now that . . . Greystar is fulfilling those responsibilities, we're conducting the other business of the managing member, which includes, for example, assuring that the annual tax return for the venture is completed, filed."); *see also supra* Section I.B.11.

[125]   RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981).

because both were "Controlled" by Katz.[126] And, as stated in Section 6.4(d)(ii), Impermissible Acts consist not only of PWA's material breaches of the Operating Agreement, but also PWA's Affiliates' material breaches of any agreement with the Company, including the Management Agreement.[127]

The Management Agreement specifies the reimbursements and compensation to which the Property Manager is entitled. Under Section 5, DPW is obligated to pay the Property Manager a management fee of 4% of the Operating Income collected monthly and the Property Manager is entitled to reimbursement of any Operating Expense that is "directly associated with the [Property]."[128] Furthermore, Sections 4 and 5 both state that the Property Manager's general overhead and administrative expenses are not to be charged to the Company because the 4% management fee is meant to cover them.

According to Plaintiffs, DRS arbitrarily allocated $88,724 in expenses to DPW during the period from 2007 to 2013 that were not associated directly with the Property.[129] Plaintiffs argue, in reliance on their expert's report, that those expenses constituted non-reimbursable overhead and administrative expenses for which DPW should not have been charged. As Defendants point out, however, the $88,724 identified

---

[126] Operating Agreement Ex. B ("'Affiliate' means, when used with reference to a specified Person . . . any person who . . . is under common Control with the specified Person . . . .").

[127] *Id.* § 6.4(d)(ii).

[128] Management Agreement §§ 2(f), 5(a)(2).

[129] JX 280 at 33-34. The total amount of uncontested payments from DPW to DRS during that period was $1,857,042. *Id.* at 32.

53

by Plaintiffs' expert appears to include some expenses that are reimbursable under the Management Agreement, including "Advertising Materials," "Computer[s]," "Property Software," and "Employee Expense Reimbursements."[130] This raises doubt as to what portion, if any, of the $88,724 in disputed reimbursements over a seven-year period actually violated the Management Agreement. I conclude, therefore, that Plaintiffs have failed to prove that DRS materially breached the Management Agreement by misallocating general overhead and administrative expenses to the Company.

### iii. DPW's distributions to the Members

Plaintiffs' third argument under Section 6.4(d)(ii) is that PWA breached the Operating Agreement and that both PWA and Katz breached their fiduciary duties by making distributions of capital to the Members in 2007 and 2008. Although Plaintiffs do not raise the issue in their briefs, if such behavior constitutes a breach of fiduciary duty by either PWA or Katz, as an Affiliate of PWA, then that would amount to an Egregious Act under Section 6.4(c)(ii), providing Cause for the Non-Managing Member to remove PWA as the Managing Member.

Plaintiffs' argument hinges on their interpretation of the Operating Agreement as prohibiting the Managing Member, PWA, from making distributions of capital to the Members in the circumstances that it did. Section 5.2 of the Operating Agreement (the "Waterfall Provision") governs DPW's distributions to the Members. According to Plaintiffs, the Waterfall Provision requires that Members receive a "Preferred Return I"

---

[130] *Compare* Management Agreement §§ 2(f), 5(a)(2), *with* JX 280 Ex. 6A.

54

*on* their capital before they receive a return *of* their capital.[131]  And, because "Preferred Return I" is defined to "include only a return on, and not a return of, capital,"[132] Plaintiffs contend that the Operating Agreement prohibits a distribution of capital before a distribution of Preferred Return I.

Before venturing too deeply into the substance of Plaintiffs' argument, I note that Defendants raised a laches defense regarding the challenged distributions.  Because it is an affirmative defense, Defendants bear the burdens of proof and persuasion on the issue of laches.[133]  "Laches is an affirmative defense that the plaintiff unreasonably delayed in bringing suit after the plaintiff knew of an infringement of his rights, thereby resulting in material prejudice to the defendant."[134]  In applying the doctrine of laches, "[a]bsent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is

---

[131]     *See* Operating Agreement §§ 5.2(c)-(d) ("Net Cash Flow from Operations and Net Capital Event Proceeds shall be applied and distributed . . . in the following order of priority: . . . (c) To the Members in proportion to their Percentage Interests until such time as each of the Members has received aggregate distributions under this subsection (c) equal to the amount of the Preferred Return I; (d) To the Members in proportion to their Additional Capital Contribution Accounts, until the aggregate amount received by each Member under this subsection (d) equals the total Additional Capital Contributions made by such Member . . . .").

[132]     *Id.* Ex. B.

[133]     *See* Ct. Ch. R. 8(c); *Penn Mart Supermarkets, Inc. v. New Castle Shopping LLC,* 2005 WL 3502054, at *5 n.40 (Del. Ch. Dec. 15, 2005) (citing *Warwick Park Owners Ass'n, Inc. v. Sahutsky,* 2005 WL 2335485, at *4 (Del. Ch. Sept. 20, 2005)).

[134]     *U.S. Cellular Inv. Co. v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del. 1996) (citations omitted).

brought after the analogous statutory period."[135] In this case, Plaintiffs have brought breach of contract and breach of fiduciary duty claims. The analogous statutory period for those claims is three years.[136] "[T]he general law in Delaware is that the statute of limitations begins to run, *i.e.*, the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action."[137] In other words, "the limitations period begins to run when the plaintiff is *objectively* aware of the facts giving rise to the wrong, *i.e.,* on inquiry notice."[138]

Plaintiffs sued on November 13, 2012. As a result, only claims based on Defendants' alleged breaches that occurred before November 13, 2009 arguably would be subject to the laches defense. DPW's distributions of capital to the Members fall into that category, as they occurred in 2007 and 2008. "Absent some unusual circumstances,"[139] therefore, the claims presumably are barred. Plaintiffs argue, however, that such unusual circumstances do exist in this case and aver that the doctrine of equitable tolling should

---

[135]   *Id.*

[136]   *See, e.g.,* 10 *Del. C.* § 8106(a); *Charney v. Am. Apparel, Inc.*, 2015 WL 5313769, at *11 (Del. Ch. Oct. 5, 2015); *Smith v. Mattia*, 2010 WL 412030, at *3 (Del. Ch. Feb. 1, 2010).

[137]   *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999).

[138]   *Id.* at *6 (emphasis in original); *see also SmithKline Beecham Pharm. Co. v. Merck & Co.*, 766 A.2d 442, 450 (Del. 2000).

[139]   *U.S. Cellular Inv. Co.*, 677 A.2d at 502.

apply to "stop[] the statute from running while [Plaintiffs] reasonably relied upon the competence and good faith of a fiduciary."[140]

Plaintiffs deny that their claims regarding the distributions are time-barred and accuse Defendants of having mischaracterized those distributions as "returns on equity," "dividends," "annualized returns," and distributions from "cash flow." Further, Plaintiffs assert that it was not obvious from DPW's financial statements that there were no profits or cash flows to support the distributions and that they were misled as to the true nature of the distributions. Rather, Plaintiffs claim they had no reason to suspect wrongdoing by Defendants and were not on inquiry notice as to the existence of the claims they now assert until after November 2009.

I disagree with Plaintiffs and conclude that they were, in fact, on inquiry notice as to the nature of the distributions by the end of 2008, if not earlier. In so concluding, I rely on the fact that each of the Investment Updates distributed during the five quarters in 2007 and 2008 in which the distributions were made, beginning in March 2007 and ending in March 2008, plainly disclosed the amount of Net Income earned by the Company and the amount of the quarterly Distribution to Partners on the first page.[141] In addition, with the exception of March 2007, each of those Investment Updates described the Net Income as "Total Net Income Available for Distribution" and also included a line

---

[140] *Forsythe v. ESC Fund Mgmt. Co.*, 2007 WL 2982247, at \*15 (Del. Ch. Oct. 9, 2007) (citation omitted).

[141] JX 21-28, 30-31, 36-37, 39.

57

item for "Addition/(Subtraction) to Working Capital," which was calculated by subtracting the amount of the distribution from the amount of Net Income.

The Addition/(Subtraction) to Working Capital was negative on every one of those Investment Updates because the distributions exceeded Net Income, which at least suggested that they were being funded by the Members' capital. In addition, Plaintiffs admitted that they received and read the monthly Investment Updates during 2007 and 2008.[142] Thus, I find that Plaintiffs were on inquiry notice as to the true nature of the distributions. As this Court stated in *Dean Witter*, "[i]t is not too much to ask investors to read beyond the first page of an annual report, to read past the rosy forecasts and actually look at the cold, hard figures provided to them."[143] "Inquiry notice does *not* require *actual* discovery of the reason for the injury. . . . Rather, the statute of limitations begins to run when plaintiffs should have discovered [the facts giving rise to their claims]."[144] In this case, Plaintiffs only needed to look at the first page of the Investment Updates to either detect the true nature of the distributions or realize that the results were

---

[142] Tr. 192 (Caiola).

[143] 1998 WL 442456, at *8. The facts of *Dean Witter* are eerily similar to those here. In that case, the plaintiffs argued that they were misled as to the fact that a distribution from a partnership was a return of capital rather than a return on investment because, in the annual report, the distribution was characterized as "an annualized return on investment of 7.5%." *Id.* But, the court pointed out that the same annual report contained "a chart showing clearly that the partners' capital had declined from the previous year. . . . [T]he fact that the distributions are consistently greater than the Partnership income *should have alerted* plaintiffs to the fact that something was amiss." *Id.* (emphasis in original).

[144] *Id.* at *7 (emphasis in original).

58

questionable and deserved further inquiry.  As a result, I conclude that the doctrine of equitable tolling does not apply here and that Plaintiffs' claims as to DPW's distributions to the Members in 2007 and 2008 are barred by laches.

### iv.    PWA's payment of Asset Management Fees to NDC Capital

Plaintiffs' fourth argument under Section 6.4(d)(ii) is that PWA breached the Operating Agreement by improperly causing DPW to pay Asset Management Fees to NDC Capital.  Plaintiffs also argue that Katz breached his fiduciary duties in this regard, which, as I noted *supra*, would constitute an Egregious Act under Section 6.4(c)(ii).  Section 8.3(c) of the Operating Agreement governs the payment of the Asset Management Fees.  Under that Section, the Asset Management Fee "of one-quarter percent (.25%) of the Project Purchase Price shall be paid annually by the Company . . . to NDC Capital Partners.  The Asset Management fee shall be due and payable in equal quarterly installments . . . ."[145]  Because the Project Purchase Price is defined as the total amount DPW paid for the Property, or $10,500,000,[146] the amount of the quarterly payments due to NDC Capital was $6,563.  PWA made these payments every quarter from the Company's inception in 2006 until Curo Enterprises replaced NDC Capital as the Asset Manager in July 2012.[147]

---

[145]    Operating Agreement § 8.3(c).

[146]    *Id.* § 2.8.

[147]    As noted in Section I.B.7.b *supra*, PWA tendered the same quarterly Asset Management Fees to Curo Enterprises when it replaced NDC Capital as the Asset Manager, but Curo Enterprises refused to accept the payment.

Section 8.3(c), however, limits the payment of Asset Management Fees "to the extent of available Net Cash Flow from Operations and Net Capital Event Proceeds, after payment of all outstanding third party debts and liabilities of the Company then due and payable, in accordance with . . . the priorities established in" the Waterfall Provision.[148] According to Plaintiffs, NDC Capital should not have been paid an Asset Management Fee in any quarter because DPW's cash flow, as calculated by Plaintiffs' expert witness, was negative in each quarter. Plaintiffs claim that Defendants knew that there was insufficient cash to pay the Asset Management Fee, but that Katz decided to pay it anyway because he wanted to benefit his relationship with NDC Capital[149] and concluded, without any documentary support, that the fees were payable. Plaintiffs challenge a total of $146,755 in payments to NDC Capital. Based on those payments, Plaintiffs argue that PWA diverted funds from the Company that were otherwise necessary to complete the Rehab Program and to make repairs to the Property, including those requested by NorthMarq in late 2012.

### (a) Asset Management Fees subject to Defendants' laches defense

Because the payment of the Asset Management Fees extended from 2006 until 2012, Defendants argue that Plaintiffs' claims are barred, at least partially, by laches. But, because Plaintiffs brought their suit on November 13, 2012, only the Asset

---

[148]   *Id.* § 8.3(c).

[149]   As detailed *supra*, Katz's business relationship with NDC Capital extended beyond DPW, as they invested in another property together and DRS managed other properties for NDC Capital.

Management Fees paid up until November 13, 2009 are potentially subject to the laches defense.[150] This includes all of the fees paid in 2007 and 2008[151] as well as the first three quarters in 2009, or $74,562 of the total $146,755 paid to NDC Capital.[152]

The standard for evaluating a laches defense is set forth *supra* in the context of my evaluation of Plaintiffs' claims regarding DPW's distributions to the Members.[153] Determining whether Plaintiffs were on inquiry notice as to the Asset Management Fees, however, is not as straightforward as it was for the Member distributions. There, the Investment Updates conspicuously showed that distributions were being made from Members' capital. Here, the Investment Updates indisputably showed that the Asset Management Fees were being paid. What is at issue is whether Plaintiffs were on inquiry notice as to the fact that there may not have been sufficient NCFO to support those fees.

Under Section 8.3(c), each quarterly Asset Management Fee is only payable to the extent of available NCFO for that quarter.[154] The monthly Investment Updates show the

---

[150]   *See supra* notes 133-138 and accompanying text.

[151]   No Asset Management Fees were paid in 2006, as the Property was not acquired until November 28, 2006. The Fees paid in 2007 appear to have been increased slightly to include the period from November 28 until December 31, 2006. *See* JX 280 Ex. 9.

[152]   *See id.*

[153]   *See supra* notes 133-138 and accompanying text.

[154]   Operating Agreement § 8.3(c). Section 8.3(c) also states that Net Capital Event Proceeds can fund the Asset Management Fees. Net Capital Event Proceeds, however, are generated by events such as sales of Members' interests in the Company, a sale of the Property, and loan refinancing, none of which occurred during the relevant period. *Id.* Ex. B. As a result, only NCFO could have funded

61

Asset Management Fees paid and the Net Cash Flow generated for both that month and the fiscal year-to-date. A cursory review of the Investment Updates from December 2007, 2008, and 2009[155] reveals that the Asset Management Fees exceeded Net Cash Flow in all three years.[156]

As both Plaintiffs' and Defendants' experts agree, however, the Net Cash Flow displayed on the Investment Updates is not the same as NCFO, as defined in the Operating Agreement. The Net Cash Flow number reported in the Investment Updates must be adjusted by, at a minimum, adding back the Asset Management Fees and the

---

the Asset Management Fees. It is unclear from the text of Section 8.3(c) and the definition of NCFO what the measurement period should be for determining whether there is sufficient NCFO—*i.e.*, whether NCFO should be calculated only for the three months in the quarter for which the Asset Management Fee is being paid, for the fiscal year-to-date, or for the period since the Company's inception, etc. Because Plaintiffs' expert used the quarterly NCFO as the relevant metric, *see* JX 280 at 16, and because Defendants' expert appears to have agreed with this methodology, *see* JX 282 at 2, I use each quarter as the appropriate measurement period.

[155] Although, arguably, only the Asset Management Fees paid through September 30, 2009 are relevant for purposes of Defendants' laches defense, I reviewed the December 2009 Investment Update rather than the September 2009 Investment Update because the latter was not included in the record.

[156] *See* JX 32, 54, 60. It appears, from examining both the April and December 2009 Investment Updates, that Asset Management Fees were only paid in the first quarter of 2009. *Compare* JX 50, *with* JX 60. While this does not impact my laches analysis, I note that it does not comport with Plaintiffs' claim, or their expert's calculation, as to the amount of Asset Management Fees improperly paid by Defendants. Because Defendants did not dispute the amount of Asset Management Fees Plaintiffs claim were paid, however, I consider this issue waived by Defendants.

distributions DPW made to its Members to get NCFO.[157]  Plaintiffs' expert independently

calculated NCFO to determine whether the Operating Agreement permitted payment of

the Asset Management Fees.  Relying solely on the DPW financial information contained

in the Investment Updates, he concluded that there was insufficient NCFO to pay the

Asset Management Fees in each quarter from 2006 until 2012.[158]  That is, Plaintiffs base

their claims on the same information they were provided at the time the Asset

Management Fees were paid in 2007, 2008 and 2009.  Thus, the claims arising from

those payments could have been brought at that time.

Plaintiffs assert that under the objective standard of inquiry notice, a reasonable

investor could not have been expected to perform the analysis their expert did to

determine whether the Asset Management Fees were paid improperly.  This argument

was also addressed by the court in *Dean Witter*:

> Although plaintiffs suggest that their claims were
> "unknowable" because it required an expert to uncover
> defendants' alleged wrongdoing, that argument is without
> merit. It may in fact have taken an expert to unravel the entire
> scheme alleged by plaintiffs. But having all of the facts
> necessary to articulate the wrong is *not* required. Rather,
> "[o]nce a plaintiff is in possession of facts sufficient to make
> him suspicious, or that ought to make him suspicious, he is
> deemed to be on inquiry notice."[159]

---

[157]    Operating Agreement Ex. B.

[158]    JX 280 at 15.

[159]    *Dean Witter*, 1998 WL 442456, at *7 n.49 (emphasis in original) (quoting *Harner v. Prudential Secs. Inc.,* 785 F. Supp. 626, 633 (E.D. Mich. 1992) (citations omitted), *aff'd,* 35 F.3d 565 (6th Cir. 1994).

The same facts that gave rise to Plaintiffs' suspicion as to the Asset Management Fees in 2012 existed when they were paid in 2007, 2008, and 2009. Hence, I find that Plaintiffs were on inquiry notice as to the Asset Management Fees paid before November 13, 2009.[160] Plaintiffs' claims as to those fees, therefore, are barred by laches.

**(b)    Asset Management Fees not subject to Defendants' laches defense**

As to the remaining $72,193 in Asset Management Fees paid to NDC Capital after November 13, 2009, Plaintiffs' and Defendants' experts disagree as to how NCFO should be calculated under the Operating Agreement. Plaintiffs' expert concluded that Asset Management Fees should not have been paid to NDC Capital in any quarter, and Defendants' expert concluded the opposite.[161] The crux of the disagreement centers on the experts' differing interpretations of the clause in Section 8.3(c) that states that the Asset Management Fee only may be paid "after payment of all outstanding third party

---

[160]    In arguing that equitable tolling should apply here, Plaintiffs cite to *Forsythe*, 2007 WL 2982247, and aver that "[t]here also was insufficient information in PWA's reports to determine whether asset management fees were properly paid." Pls.' Reply Br. 30. That contention is contradicted by Plaintiffs' expert's sole reliance on the Investment Updates in determining that the Asset Management Fees were paid improperly. JX 280 at 15. Further, Plaintiffs' reliance on *Forstythe* is misplaced here because the court in that case found that the plaintiffs did not possess the information necessary to bring their claim until after the statutory period expired. *Forsythe*, 2007 WL 2982247, at *15. Here, because Plaintiffs had all of the information they needed to put them on inquiry notice before November 2009 and failed to adduce any evidence that they could not have obtained any additional information they needed during the same time period, I do not consider this to be an appropriate case for the application of equitable tolling.

[161]    JX 280, 282.

debts and liabilities of the Company *then due and payable*."[162] According to Plaintiffs, this means that all liabilities that had accrued by the end of the quarter in question, including Accounts Payable and Taxes Payable, should be subtracted from NCFO to determine whether the Asset Management Fees should be paid. Defendants, on the other hand, contend that only past-due invoices should be subtracted from NCFO.[163]

I find Plaintiffs' interpretation to be correct for three main reasons. First, Plaintiffs' interpretation of Section 8.3(c) more closely comports with the text of that section, which states that the Asset Management Fee may only be paid after "payment of *all outstanding* third party debts and liabilities."[164] Nowhere does Section 8.3(c) limit those debts and liabilities to invoiced amounts only or to invoices that are past due. According to the plain language of Section 8.3(c), all accrued liabilities and debts should be subtracted from NCFO before paying the Asset Management Fees. Second, I credit the testimony of Edwards and Katz that PWA treated the payment of the Asset Management Fees as essentially "a given" and that Katz would pay them even if net cash flow was negative.[165] Third, I consider it relevant that Plaintiffs' expert is independent, while Defendants' expert, Gottlieb, has worked with Katz for the past twelve years,

---

[162]  Operating Agreement § 8.3(c) (emphasis added).

[163]  Tr. 779-80 (Gottlieb).

[164]  Operating Agreement § 8.3(c) (emphasis added).

[165]  Edwards Dep. 34; Tr. 439 (Katz).

65

performing accounting services for six different properties, including the Property.[166] For these reasons, I give the testimony and calculations of Plaintiffs' expert more weight on this issue.

Because I accept Plaintiffs' expert's calculations regarding the amount of NCFO available to be paid as Asset Management Fees, I conclude that the $72,193 in Asset Management Fees paid to NDC Capital after November 13, 2009 was made in breach of Section 8.3(c) of the Operating Agreement. In addition, considering the cash-starved nature of DPW's business, I also find that this breach was material and constituted an Impermissible Act under Section 6.4(d)(ii) of the Operating Agreement. The Rehab Program was implemented as part of the Company's investment strategy to reposition the Property and increase rents. Because PWA paid the Asset Management Fee without regard to the Operating Agreement's prescribed procedures, it improperly diverted funds away from DPW that were otherwise necessary for capital expenditures and to perform repairs on the Property. These items were budgeted for in each Business Plan, the preparation and implementation of which were PWA's responsibility under the Operating Agreement.[167] Because the Rehab Program and the Business Plans represent DPW and Plaintiffs' expectations with respect to PWA's performance, I find that actions taken in breach of the Operating Agreement that inhibit their implementation go to the root of the Operating Agreement, touch on its fundamental purpose, and deprive Plaintiffs of the

---

[166]    Gottlieb Dep. 16-19.

[167]    Operating Agreement § 7.11.

66

benefit of their bargain.  Moreover, although $72,193 is not a large amount in comparison to the Property's purchase price of $10.5 million, its importance is magnified when viewed in the context of the Company's negative net cash flow and working capital.

### (c) Katz's fiduciary duties to the Company and its Members

As to whether Katz breached any fiduciary duties, Plaintiffs claim that Katz paid the Asset Management Fees to benefit his relationship with NDC Capital, which extended to other properties, and that he therefore breached his duty of loyalty.  In the circumstances of *In re USACafes, L.P. Litigation*, Chancellor Allen held that the directors of a corporate general partner in a limited partnership owe a fiduciary duty to the limited partnership and the limited partners in addition to the stockholders of the corporate general partner.[168]  While the court in *USACafes* did not "delineate what the scope of a director's fiduciary duty might be . . . [it] did . . . conclude that any duty owed included the duty not to use control over [the limited partnership's] property to the advantage of a director at the expense of [the limited partnership]."[169]  "This court has followed *USACafes* consistently, holding that the individuals and entities who control the general partner owe to the limited partners at a minimum the duty of loyalty identified in

---

[168]    600 A.2d 43 (Del. Ch. 1991).

[169]    MARTIN I. LUBAROFF & PAUL M. ALTMAN, DELAWARE LIMITED PARTNERSHIPS § 11.2.11 at 11-34 (2015).

*USACafes*."[170]  *USACafes* also has been extended to business entities acting as the managing member in the LLC context.[171]

Katz is a 10% owner and the managing member of PWA, the Company's Managing Member. As a result, under the *USACafes* line of cases, Katz would owe a duty of loyalty to DPW in at least certain circumstances. Based on the evidence presented at trial, however, I find that Plaintiffs have not shown that Katz's actions implicate a breach of the duty of loyalty. Plaintiffs do assert that Katz acted in his own self-interest and to DPW's detriment by improperly paying the Asset Management Fees to benefit his relationship with NDC Capital. Plaintiffs ignore, however, the fact that if NDC Capital's Asset Management Fees were not paid, they would have accrued[172] and do not allege that NDC Capital had any specific need for immediate payment of those fees during the relevant time period. Further, although Plaintiffs point to the fact that Katz and NDC Capital were co-investors in another property and that DRS—Katz's property management company—managed other properties in which NDC Capital had

---

[170]   *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 670-71 (Del. Ch. 2012) (collecting authorities). The duty of loyalty identified in *USACafes* related to a sale of substantially all of the assets of the subject limited partnership in which the directors of the corporate general partner received substantial side payments in connection with the sale. *USACafes*, 600 A.2d at 46.

[171]   *See, e.g.*, *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *8-9 (Del. Ch. Apr. 20, 2009); *Paige Capital Mgmt., LLC v. Lerner Master Fund, LLC*, 2011 WL 3505355, at *30 (Del. Ch. Aug. 8, 2011).

[172]   *See* Operating Agreement § 8.3(c). Because of the accrual feature of the Asset Management Fees, DPW presumably would have paid those fees to NDC Capital eventually.

invested, they did not present any evidence as to whether the business relationship with NDC Capital was material to Katz.

Plaintiffs barely even raised the issue of Katz's fiduciary duty to DPW and its Members in their briefs. Indeed, Plaintiffs failed to cite *USACafes* or its progeny or any other case for the proposition that Katz owes a fiduciary duty to DPW and its Members regarding the relatively routine payments at issue in this case. Rather, Plaintiffs asserted, in conclusory fashion, that "Katz's participation and approval of such payments also constitutes a breach of fiduciary duty by Katz to DPW because he approved the fees to benefit his relationship with NDC Capital"[173] and that "NDC Capital gave substantial business to Katz."[174] Notably, PWA attempted to make the same Asset Management Fee payment to Curo Enterprises when it replaced NDC Capital. Based on that fact and the relatively automatic way in which Katz caused DPW to pay that fee each quarter, I consider it equally likely that any breach of fiduciary duty in that regard would be one of care. But, under *Feeley*, although Katz could be sued by Plaintiffs "for breach of fiduciary duty in his capacity as the party who controls [PWA], he cannot be sued in that capacity of breach of the duty of care."[175]

In sum, the record in support of Plaintiffs' claim against Katz for breach of fiduciary duty is not developed adequately. As the Delaware Supreme Court stated in

---

[173]    Pls.' Opening Br. 49.

[174]    Pls.' Reply Br. 21.

[175]    *Feeley*, 62 A.3d at 667.

*Brinckerhoff v. Enbridge Energy Co.*, "[t]his type of 'throwaway argument' is not sufficient to gain any traction."[176] Hence, I conclude that Plaintiffs have not met their burden to prove as a matter of fact and of law that Katz breached his fiduciary duty to DPW or Plaintiffs as a result of the Company's payment of Asset Management Fees to NDC Capital.

### v. Curo Enterprises's replacement of DRS with Greystar

Plaintiffs' fourth argument under Section 6.4(d)(ii) is that DRS breached the Management Agreement by resisting Curo Enterprises's attempts to replace DRS with Greystar as the Property Manager. Similar to their claim regarding DRS's expense reimbursements,[177] Plaintiffs argue that an Impermissible Act has occurred under Section 6.4(d)(ii) because DRS, a PWA affiliate, has materially breached the Management Agreement.[178] According to Plaintiffs, Curo Enterprises, which became the Asset Manager in July 2012, had the right under the Management Agreement's termination provisions[179] to terminate that agreement between DPW and DRS on DPW's behalf. Plaintiffs further assert that by refusing to step down as the Property Manager after that termination, DRS materially breached the Management Agreement.

---

[176]    67 A.3d 369, 372 n.11 (Del. 2013).

[177]    *See supra* Section II.B.1.d.ii.

[178]    Operating Agreement § 6.4(d)(ii).

[179]    Management Agreement § 6.

70

In support of their claim that Curo Enterprises was authorized to terminate the Management Agreement on DPW's behalf, Plaintiffs rely on the ruling in the Kansas Action by the Kansas Court of Appeals.[180] In that case, the Kansas Court of Appeals reversed the trial court, holding, in relevant part: (1) that Curo Enterprises had the right to enforce the Management Agreement on DPW's behalf under Section 14 of that agreement as the Asset Manager and the Company's agent; and (2) that Curo Enterprises was the "Prevailing Party" in the Kansas Action and, therefore, was entitled to its attorneys' fees under Section 21 of the Management Agreement.[181] While the decision by the Kansas Court of Appeals as to those two issues presumably is entitled to collateral estoppel effect,[182] the Kansas court did not address whether DRS breached, materially or otherwise, the Management Agreement by resisting Curo Enterprises's attempts to terminate that agreement. Thus, I do not consider any party to this action to be precluded from litigating that issue.

---

[180]   *Curo Enters., LLC v. Dunes Residential Servs., Inc.*, 342 P.3d 948 (Kan. Ct. App. 2015).

[181]   *Id.* at 954, 958. Defendants claim to have appealed the judgment of the Kansas Court of Appeals, but the record in this case does not indicate the status of that appeal.

[182]   "Collateral estoppel, also known as issue preclusion, prevents a party who litigated an issue in one forum from later relitigating that issue in another forum." *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, 2014 WL 5509787, at *11 (Del. Ch. Oct. 31, 2014). "Collateral estoppel applies if: (1) the same issue is presented in both actions; (2) the issue was litigated and decided in the first action; and (3) the determination was essential to the prior judgment." *Zutrau v. Jansing*, 2014 WL 3772859, at *41 (Del. Ch. July 31, 2014), *aff'd*, __ WL __ (Del. Aug. 26, 2015).

Although DRS arguably may have breached the Management Agreement by resisting Curo Enterprises's attempts to terminate that agreement, I find that Plaintiffs have failed to prove DRS's actions constitute a material breach. DRS appears to have resisted Curo Enterprises's termination attempts in good faith, and Plaintiffs have not adduced probative evidence to the contrary. Admittedly, the Kansas Court of Appeals eventually adopted Curo Enterprises's interpretation of Section 14 of the Management Agreement, but the fact remains that the trial court in the Kansas Action agreed with DRS that Curo Enterprises did not have the power to terminate that agreement.[183] This leads me to conclude that DRS's resistance was made in good faith and on a reasonable basis.

In arguing that DRS's breach was material, Plaintiffs state that "[n]o provisions in the Management Agreement could be more material than the provisions granting Curo Enterprises the right to terminate its very existence."[184] This argument is unpersuasive. In terms of whether the breach was "material," Plaintiffs have not presented any specific evidence as to any harm they or DPW suffered as a result of DRS's alleged breach, the parties' expectations in negotiating the Management Agreement, or whether the alleged breach defeated the purpose of entering into that agreement in the first place. On the contrary, it appears that Plaintiffs did receive the benefit of the bargain its predecessor, NDC Capital, expected when it entered into the Management Agreement. Curo Enterprises purported to terminate that agreement on DPW's behalf under Sections 6 and

---

[183]    *Curo Enters., LLC*, 342 P.3d at 82.

[184]    Pls.' Opening Br. 50.

72

14, and DRS resigned, albeit not as promptly as Plaintiffs desired. Curo Enterprises then moved for attorneys' fees against DRS under Section 21 of the agreement and ultimately prevailed. I conclude that in such a situation—where DRS resisted Curo Enterprises's termination attempts in a manner that comports with standards of good faith and fair dealing and where Curo Enterprises eventually received the benefit it expected under the Management Agreement, including attorneys' fees—no material breach has occurred. I hold, therefore, that DRS's resistance to Curo Enterprises's attempts to terminate the Management Agreement did not constitute an Impermissible Act.

### vi. PWA's maintenance of DPW's financial records

Finally, Plaintiffs argue under Section 6.4(d)(ii) that PWA breached its obligations under the Operating Agreement to maintain accurate and consistent books and records of the Company.[185] Sections 7.1 and 7.2 of the Operating Agreement impose these obligations on PWA, stating that "[t]he books and records of the Company shall be kept by the Managing Member in accordance with GAAP or the method of accounting determined appropriate by the accountants for the Company . . . with the approval of

---

[185] Although they did not raise the issue in their Opening Brief, Plaintiffs assert, in their Reply Brief, that Katz breached his duty of care because, as PWA's managing member, he was in charge of all of DPW's finances and had ultimate authority for the financial statements. Because I concluded *supra* that, at most, Katz owed DPW and its Members only a duty of loyalty, I reject this argument. *See supra* notes 168-171 and accompanying text.

73

NDC Capital Partners, applied on a consistent basis"[186] and that those books and records should "fully and accurately [reflect] all transactions of the Company."[187]

Plaintiffs' expert lists a number of ways in which PWA breached Sections 7.1 and 7.2. These alleged deficiencies include: (1) inconsistencies between the Investment Updates, tax returns, and general ledgers; (2) use of accrual basis cash flow statements; (3) misleading Investment Updates; (4) unexplained retained earnings adjustments; (5) inconsistencies between the balance sheets and income statements; and (6) conflicts between the balance sheets' accounts receivables figures and the accounts receivables aging reports.[188]

From the first time Caiola met with PWA and Katz, it has been Plaintiffs' objective to replace PWA as the Managing Member of DPW, preferably with an affiliate of Plaintiffs. In general, therefore, I am skeptical as to the materiality of PWA's alleged breaches of Sections 7.1 and 7.2. That skepticism is increased by Plaintiffs' heavy reliance on DPW's financial statements in bringing, and in prosecuting, this action. If the unreliability of DPW's financial statements rose to such a level as to constitute a material breach of the Operating Agreement, then Plaintiffs' other claims—including those regarding the distributions to Members, the Asset Management Fees, and the reimbursements to DRS, as well as their general allegations regarding DPW's poor

---

[186]    Operating Agreement § 7.1.

[187]    *Id.* § 7.2.

[188]    JX 280 at 23-28.

financial condition under PWA and DRS's management—would be largely dependent on other, internal information obtained through discovery. In addition, if Plaintiffs were dissatisfied with the manner in which PWA kept DPW's books and records, they could have raised that complaint much earlier and given PWA an opportunity to cure the alleged deficiencies. Plaintiffs' delay in doing so has prejudiced PWA by creating a potential pretext for its removal as the Managing Member. Thus, because Plaintiffs essentially have undermined any claim regarding the completeness, accuracy, and consistency of DPW's financial statements by using the information in those statements to form the bases of their contentions that PWA and Katz breached the Operating Agreement and their fiduciary duties, and because Plaintiffs appear to have made their claims that DPW's financial records are inadequate for self-interested, pretextual reasons, I find that the breaches they allege are not material. Accordingly, I conclude that no Impermissible Act has occurred in conjunction with the preparation of DPW's financial statements.

### 2. The First and Second Capital Calls

In addition to their claims under Section 6.4(d) of the Operating Agreement, Plaintiffs assert that PWA should be removed as the Managing Member because it failed to contribute to the First and Second Capital Calls under Sections 4.3, 4.4, and 6.4(e). Section 4.3 establishes the grounds on which "each Member shall have the right, but not the obligation, to make additional capital contributions to the Company (the 'Additional Capital Contributions') as the Managing Member or [CFT] . . . shall determine are

75

required by the Company . . . ."[189] Those grounds include a need for funds required "to pay emergency expenditures that are necessary to protect against injury to persons or damage to property ('Emergency Expenditures')" and "to satisfy any obligation under the First Mortgage Loan . . . ."[190] Section 4.4(a) provides that "[i]f any Member fails to fund its Proportionate share of any Additional Capital Contribution," that Member will be designated a "Non-Contributing Member."[191] Under Section 4.4(c), any Member that "fails to make two (2) consecutive Additional Capital Contributions" will be a "Forfeiting Member," and if "the Forfeiting Member is the Managing Member, then, in that event, [CFT] shall also have the right, in the exercise of their sole discretion, to remove the Managing Member as the Managing Member of the Company pursuant to Section 6.4(e)."[192] Finally, Section 6.4(e) provides the procedure by which the Managing Member may be removed and replaced and the effect of such removal.[193]

Plaintiffs assert two grounds under which the First and Second Capital Calls were authorized under Section 4.3(a). First, Plaintiffs claim that the Capital Calls were needed to fund Emergency Expenditures, as defined in the Operating Agreement. Second, Plaintiffs argue that the Capital Calls were necessary to meet the Company's obligations

---

[189] Operating Agreement § 4.3(a).

[190] *Id.*

[191] *Id.* § 4.4(a).

[192] *Id.* § 4.4(c) (underlining omitted).

[193] *Id.* § 6.4(e).

76

under the Mortgage. Defendants deny that either of these grounds provides a valid basis for making a Capital Call under Section 4.3(a) and argue that they should not be considered a Forfeiting Member under Section 4.4(c) or be removed as the Managing Member pursuant to Section 6.4(e).

### a. Making Emergency Expenditures

Emergency Expenditures are defined as "expenditures that are necessary to protect against injury to persons or damage to property."[194] Plaintiffs contend that the funds from the First and Second Capital Calls were used to address repairs that "were critical to tenant and visitor safety and to prevent further damage or deterioration to" the Property.[195] To support their argument, Plaintiffs' point to: (1) Hutchens's testimony that the repairs completed with the funds from the Capital Calls "address either issues to protect against injury to person or property;"[196] and (2) the fact that a tenant was injured on a stairway in 2014 when a rusted angle iron supporting the step collapsed.[197]

Defendants respond, in part, by citing to a dictionary definition of "emergency" to show that the funds from the Capital Calls were not necessary. But, their reliance on that definition is misplaced because Emergency Expenditures is defined in the Operating

---

[194]    *Id.* § 4.3(a)(ii).

[195]    Pls.' Opening Br. 47.

[196]    Hutchens Dep. 155-57.

[197]    *Id.* at 30.

Agreement.[198]  Based on that definition, the crucial issue is whether the funds from the Capital Calls were truly "necessary" to protect against injury to tenants and visitors and damage to the Property.  For this determination, I consider it relevant that many of the repairs identified by Greystar as either "life safety" or "required" repairs are similar to items that Katz himself previously characterized as "Emergency Expenditures."[199]

The parties' course of performance is instructive not only in identifying items that constitute "Emergency Expenditures,"[200] but also in evaluating the amount of additional capital being sought for those expenditures.  In the two instances in which Katz stated that he needed to make Emergency Expenditures, the amounts totaled approximately $25,000 and $13,000, respectively.  The two Capital Calls, on the other hand, sought roughly $300,000 for repairs.  Moreover, to the extent that more Emergency Expenditures were needed in 2013 than in prior years, it is likely that Plaintiffs themselves contributed to that necessity by refusing, without a reasonable justification,[201]

---

[198]  Operating Agreement § 4.3(a).

[199]  JX 164, 170.

[200]  *See, e.g.*, *Sun-Times Media Gp., Inc. v. Black*, 954 A.2d 380, 398 (Del. Ch. 2008) ("When the terms of an agreement are ambiguous, 'any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.'" (quoting RESTATEMENT (SECOND) OF CONTRACTS § 202)); RESTATEMENT (SECOND) OF CONTRACTS § 202 cmt. g ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.").

[201]  Defendants submitted the 2013 Business Plan to Plaintiffs with two versions of the budget, the second of which was premised on improved metrics.  Under both versions, the budgeted amount for repairs was $75,307 and the budgeted amount

to approve PWA's proposed budget for repairs and capital expenditures for 2013. Defendants further raise doubt as to the necessity of the Capital Calls by pointing to the Asset Management Report, issued by Curo Enterprises in December 2013, which recommended a number of improvements for the purpose of repositioning and reintroducing the Property—*i.e.*, for making it more marketable and obtaining higher rents—that Greystar had identified as life safety, required, and recommended repairs in its property condition assessment, issued in October 2013.[202]

Given the timing of these reports in relation to the First and Second Capital Calls, which were issued in November 2013 and August 2014, respectively, I find it more likely than not that a majority of the repairs to be performed with the funds from the Capital Calls were not justified under Section 4.3(a) as Emergency Expenditures. I also note that Plaintiffs still were performing some of those repairs and improvements on the Property at the time of trial, over a year and a half after the First Capital Call. Thus, although a portion of the funds raised from the Capital Calls may have been valid Emergency Expenditures, I find that much of it was not. I also do not read Section 4.3(a) as contemplating a system whereby Members initially can issue partially valid Capital Calls;

---

for capital expenditures was $66,680. By comparison, the budgeted amounts for repairs and capital expenditures in 2012 were $7,125 and $33,378, respectively. When Cox was asked at trial why Plaintiffs did not approve the 2013 Business Plan, he responded, "Is it budget 1 or is it budget 2? So how about no budget? And you can operate per the 2012 budget. That was our decision." Tr. 333. Cox's cavalier approach to that budget-related decision further supports my finding that Plaintiffs' primary focus here was on ousting PWA as the Managing Member.

[202]    JX 187.

rather, either the full amount is warranted, or none of it is. As to the First and Second Capital Calls, therefore, I find that neither was justified under Section 4.3(a).

### b. Satisfying obligations under the Mortgage

Similarly, I do not agree with Plaintiffs' contention that the Capital Calls were necessary under Section 4.3(a)(v) to satisfy the Company's Mortgage obligations. Contrary to Plaintiffs' assertion, DPW's commingling of tenant security deposits and operating funds does not create a breach of Section 10 of the Mortgage[203] because Kansas law does not require the maintenance of segregated security deposit accounts.[204] In addition, as to Section 17 of the Mortgage,[205] I agree with Defendants that the record does not support Plaintiffs' claim that almost $350,000 was necessary to meet repair

---

[203] Mortgage § 10 ("Borrower . . . shall comply with all applicable laws that pertain to the maintenance and disposition of tenant security deposits.").

[204] Plaintiffs concede that no applicable statute mandates security deposits at a multi-family complex be segregated from operating funds, but argue that the case law demonstrates that commingling funds entrusted to a fiduciary is a breach of the duty of care in Kansas. For this proposition, Plaintiffs cite *In re Bryant Manor, LLC*, 422 B.R. 278 (Bankr. D. Kan. 2010). The court's decision in *Bryant*, however, does not indicate that commingling security deposits violates a fiduciary duty or any other law. *Id.* at 291-92. At most, the court expressed its view that such commingling constitutes mismanagement by a property manager. *Id.* Thus, although Plaintiffs probably are correct that commingling tenant security deposits and operating funds is contrary to best practices, *Bryant* does not hold that such commingling constitutes a violation of a fiduciary duty, and Plaintiffs' citation of it for that proposition is misplaced.

[205] Mortgage § 17 ("(a) Borrower shall not commit waste or permit impairment or deterioration of the [Property]. . . . (c) Borrower shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the [Property] to the equivalent of its original condition . . . (d) Borrower shall keep the [Property] in good repair . . . .").

80

obligations to NorthMarq.[206] To the extent Plaintiffs rely on NorthMarq's December 11, 2013 letter identifying requested repairs to the Property, I note that the letter was sent after the First Capital Call, and, as Defendants' property management expert, Peters, testified, NorthMarq frequently sent similar letters at other properties and the letter sent to DPW was "not out of the ordinary."[207] Rather, I find that although NorthMarq's December 11, 2013 letter might support some of the requested repairs in the First and Second Capital Calls, it is insufficient to prove that much of the amount requested was necessary to satisfy DPW's Mortgage obligations.

Finally, Plaintiffs' reliance on Greystar's assessment of the Property's condition when it took over in October 2013 misses the mark. The standard for measuring DPW's compliance with Section 17 is a relative rather than an absolute one. To illustrate, Section 17(a) prohibits the "*deterioration* of the [Property];" Section 17(c) requires DPW to restore or repair the Property "to the equivalent of its *original condition*;" and Section 17(d) obligates DPW to "*keep* the [Property] in good repair."[208] Each of these phrases indicates that DPW's compliance with Section 17 is measured in relation to the Property's condition at the time the Mortgage was executed. Although Greystar subjectively may have disapproved of the condition of the Property when it took over as the Property Manager, Greystar's assessment is not dispositive as to whether DPW risked

---

[206]    Defs.' Answer Br. 40.

[207]    Tr. 761.

[208]    Mortgage §§ 17(a), (c)-(d) (emphasis added).

81

breaching Section 17. As a result, I conclude that Plaintiffs also have failed to prove that Section 4.3(a)(v) provided a valid basis for the First and Second Capital Calls.

### c. Legal effect of the two Capital Calls

As I concluded above, neither Capital Call was justified under Section 4.3(a). Taking into account all of the facts of record, I find it likely that, at least in part, Plaintiffs issued the two Capital Calls to force Defendants' hand in an attempt to create a situation in which PWA could be designated as a Forfeiting Member under Section 4.4(c) of the Operating Agreement or induced to sell its interest in DPW or buy Plaintiffs' interest. This determination is reinforced by Plaintiffs' implementation of similar strategies to gain control of the other NDC Investments.[209] For these reasons, I decline to give the Capital Calls effect as Additional Capital Contributions under the DPW Operating Agreement and hold that PWA cannot be considered either a Non-Contributing Member under Section 4.4(a) or a Forfeiting Member under Section 4.4(c) of the agreement.

It is undisputed, however, that CFT actually did contribute $348,052 to DPW via the First and Second Capital Calls and that, for the most part, those funds were used for the purposes stated in the First and Second Capital Calls, including for making a number of repairs and improvements. There arguably could be a windfall to PWA, therefore, which owns 10% of the Company's membership interests and likely would benefit from Plaintiffs' contributions and the use of those funds to repair and improve the Property, if CFT is given no "credit" for its infusion of $348,052 to DPW, either in terms of

---

[209] *See supra* notes 23-28 and accompanying text.

additional equity or having the payments treated as some form of a loan. In evaluating this possibility, I look first to the Operating Agreement for guidance.

The agreement does not address this precise situation. It does discuss, however, the somewhat analogous situation of a Managing Member making the equivalent of a defective capital call. Specifically, Section 4.3(b) provides, in relevant part:

> Notwithstanding anything set forth herein to the contrary, without the approval in writing in each instance by NDC and a Majority Vote of the Investment Members [*i.e.*, CFT], the Managing Member shall not have any right to use Company assets to pay for, nor any right to call for, and the Members shall not have the right or obligation to make, any Additional Capital Contributions for the purpose of funding any cost, expense or liability: . . . (ii) that is in excess of available amounts (A) set forth in the then applicable Annual Business Plan (other than Emergency Expenditures and Additional Permitted Expenditures), or (B) necessary to satisfy the Company's Permissible Indemnity Obligations to the Managing Member or (C) necessary to satisfy any obligation under the First Mortgage Loan (to the extent not otherwise provided in any applicable Annual Business Plan). Amounts paid, from time to time, by the Managing Member (or any Affiliate thereof) on account of any cost, expense or liability with respect to which a capital call is prohibited by the preceding sentence without the prior written approval of [CFT] shall be paid from the Managing Member's assets and shall not be treated as Capital Contributions or a loan to the Company for the purposes of this Agreement. The Managing Member shall not be entitled to reimbursement from the Company or from any Member for such expenses. The parties to this Agreement intend that each Additional Capital Contribution be treated as a Capital Contribution only if all Members make such Additional Capital Contribution, and that if any Member fails to make such contribution, all  such

> amounts contributed by the Contributing Members shall be treated as a loan as provided in Section 4.4.[210]

Thus, if the Managing Member contributed funds to DPW to pay certain expenses as part of a defective capital call, it would "not be entitled to reimbursement from the Company or from any Member for such expenses."

In the circumstances of this case, I conclude that the most equitable way to handle Plaintiff CFT's payment of a total of $348,052 pursuant to purported capital calls for amounts in excess of what was authorized under the Operating Agreement is to treat them as comparable to unauthorized payments of expenses by the Managing Member. That is, Plaintiffs would not be entitled to reimbursement from the Company or PWA for such payments. I reach this conclusion because, during the interim period from October 1, 2013, when Plaintiffs' affiliate Curo Enterprises, as the Asset Manager of DPW, caused DRS to be replaced by Greystar as the Property Manager, until the Second Capital Call on July 31, 2014, the uncertainty engendered by this litigation effectively created a vacuum as to the position of Managing Member. In the context of that vacuum and the day-to-day control of DPW's operations by CPW and Greystar, Plaintiffs caused the First and Second Capital Calls to be made. Plaintiffs, therefore, should bear the responsibility for those capital calls being deficient, just as the Managing Member would under the portion of Section 4.3(b) quoted above. In addition, the money contributed by Plaintiffs presumably benefited DPW, of which CFT owns a 90% interest. Finally, by virtue of this

---

[210]    Operating Agreement § 4.3(b) (underlining omitted).

84

Memorandum Opinion, the validity of PWA's removal as the Managing Member of DPW has been confirmed, and Plaintiffs now will be able to control the appointment of the new Managing Member and, thus, presumably the future direction of DPW.

### C. Is DPW Entitled to Money Damages From PWA or Katz?

Plaintiffs assert two alternate means of computing the damages that they claim PWA and Katz owe to DPW.

#### 1. Plaintiffs' request for direct damages

First, under Plaintiffs' direct method of calculating damages, they argue that Defendants owe a total of $567,453, which is the sum of: (1) the $331,974 that DPW distributed to the Members in 2007 and 2008; (2) the $146,755 in Asset Management Fees that DPW paid to NDC Capital; and (3) the $88,724 that Plaintiffs claim DRS improperly took as reimbursements. Plaintiffs then argue that because those damages occurred from 2007 to 2013, DPW is entitled to pre-judgment interest. As a result, with the inclusion of pre-judgment interest at the statutory rate under Delaware law, Plaintiffs claim that Defendants owe a total of $918,000 to DPW in damages.

As to the three claimed categories of damages, I determined *supra* that Plaintiffs' claims regarding the distributions to DPW's Members in 2007 and 2008 were barred by laches.[211] I also determined that $74,562 of the total $146,755 in Asset Management Fees paid to NDC Capital was barred by laches.[212] Regarding the $88,724 that Plaintiffs

---

[211] *See supra* Section II.B.1.d.iii.

[212] *See supra* Section II.B.1.d.iv.

85

claim DRS improperly took as reimbursements, I found that Plaintiffs did not prove that any such breach was material. Hence, PWA is exculpated under Section 6.3 for this aspect of the claimed damages because the alleged breach did not constitute Cause under Section 6.4(b). The only caveat is that Plaintiffs' claim might fall within one of the exceptions to Section 6.3. That section provides, in relevant part:

> Unless for an action constituting "Cause (as defined in Section 6.4(b)), the Managing Member shall not be liable or obligated to the Members for any mistake of fact or judgment made by the Managing Member in operating the business of the Company that results in any loss to the Company or its Members. . . . [T]he Managing Member shall not be responsible to the Members because of a loss of that Member's investment or a loss in operations, provided, however, that the foregoing shall not limit the Managing Member's liability in connection with any loss that has been occasioned by fraud, self-dealing (in contravention of this Agreement), willful misconduct, gross negligence, a wrongful misappropriation or taking by the Managing Member, or any other act by the Managing Member that constitutes "Cause" as defined in Section 6.4(b) (but without regard to the notice and/or cure periods provided therein).[213]

Plaintiffs have not shown that any of the exceptions to exculpation stated in Section 6.3 would apply to the damages claim based on DRS's reimbursement. Thus, PWA is not liable on that claim. In addition, I note that, in their briefs, Plaintiffs do not contend that PWA breached the Operating Agreement as to DRS's reimbursements. Plaintiffs only argue that DRS breached the Management Agreement, and DRS is not a named defendant in this action.

---

[213]    Operating Agreement § 6.3 (underlining omitted).

I conclude, therefore, that the only damages that Plaintiffs can claim Defendant

PWA owes to DPW are the $72,193 in Asset Management Fees that are not barred by

laches. DPW also is entitled to pre-judgment interest on that amount of $21,323.[214]

Further, because I held that Katz did not breach any fiduciary duties owed to DPW,[215] I

dismiss any claims against him for damages owed to the Company or Plaintiffs. In

summary, therefore, based on Plaintiffs' request for direct damages, PWA owes DPW a

total of $93,516.

### 2.     Plaintiffs' request for alternative damages

Second, Plaintiffs set forth an alternative method for calculating DPW's "damages

based on comparable industry data had PWA and Katz operated the Company without

breaching their fiduciary duties."[216] I reject this method of calculating damages for a

---

[214] *Aveta Inc. v. Bengoa*, 2010 WL 3221823, at \*2 (Del. Ch. Aug. 13, 2010) ("When a party has a right, contractual or otherwise, to a monetary amount, the party 'is entitled to prejudgment interest running from the date the payment is due.' . . . The right to pre-judgment interest demonstrates that the duty to pay arises out of the underlying obligation, not the judicial order enforcing it." (quoting *Hercules, Inc. v. AIU Ins. Co.*, 784 A.2d 481, 508 (Del. 2001))).

To calculate pre-judgment interest, I noted the amount of the Asset Management Fees paid to NDC Capital by DPW in each quarter from the fourth quarter in 2009 until the second quarter in 2012 per Plaintiffs' expert's report. *See* JX 280 Ex. 2A. For each of those quarterly payments, I calculated the amount of interest that would have been earned had that payment instead been invested at the legal rate of interest under Delaware law, 6 *Del. C.* § 2301(a), from the time of the payment until the date of this Opinion, compounded quarterly. I then summed the interest that would have been earned on each of the Asset Management Fees to get the total pre-judgment interest of $21,323.

[215] *See supra* Sections II.B.1.d.iv & II.B.1.d.vi.

[216] Pls.' Opening Br. 55.

number of reasons. First, I concluded *supra* that neither PWA nor Katz breached any fiduciary duties to the Company or its Members. Second, Plaintiffs' rationale for using this alternative method of calculating damages is largely rooted in their claim that PWA breached the Operating Agreement by keeping inaccurate, incomplete, and inconsistent financial statements. As I previously held, however, Plaintiffs failed to prove that any such breach was material. I am not persuaded, therefore, that those alleged breaches warrant jettisoning DPW's financial records and resorting to an entirely hypothetical damages model. Finally, "[u]nder Delaware law, a plaintiff can only recover those damages which can be proven with reasonable certainty. Moreover, '[n]o recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural or speculative.'"[217] I find Plaintiffs' alternative method based on comparable industry data to be too speculative to sustain their requested damages award.

**D.      Is Either Party Entitled to Attorneys' Fees Under the Operating Agreement?**

Both parties seek attorneys' fees under Section 16.14 of the Operating Agreement, which contains a fee-shifting provision in favor of the "prevailing party" in "any action or proceeding to enforce this Agreement or any provision hereof."[218] Under Delaware law, "to be declared the prevailing party, a litigant must achieve 'predominance in the

---

[217]    *Pharmathene, Inc. v. SIGA Techs., Inc.*, 2010 WL 4813553, at *11 (Del. Ch. Nov. 23, 2010) (quoting *Callahan v. Rafail,* 2001 WL 283012, at *1 (Del. Super. Mar. 16, 2001)).

[218]    Operating Agreement § 16.14.

litigation.'"[219]  To achieve predominance, a litigant should prevail on the case's "chief issue."[220]

In this case, the chief issue by any metric was whether CFT had Cause under the Operating Agreement to remove PWA as the Managing Member.  Because I concluded that CFT did have Cause under Sections 6.4(d)(ii) and (viii) of the Operating Agreement to remove PWA as the Managing Member, I conclude that they are the prevailing party and can recover their attorneys' fees against Defendants under Section 16.14 of the Operating Agreement.

I hold, however, that Plaintiffs are entitled to recover from Defendants 50% of the fees they reasonably incurred in this action rather than the full amount of their fees.  I base this conclusion on the fact that Plaintiffs employed somewhat of a "kitchen sink" approach in this action, asserting nine bases on which they purportedly had the right to remove PWA as the Managing Member and prevailing on only two of those bases. Plaintiffs also sought between $918,000 and $1,590,000 in total damages, but ultimately were awarded less than $100,000.  Although Plaintiffs were the prevailing party, this Court has held that "[w]here the plaintiff's success is not entire, the [Court] has discretion

---

[219]  *Vianix Del. LLC v. Nuance Commc'ns, Inc.*, 2010 WL 3221898, at *28 (Del. Ch. Aug. 13, 2010) (citation omitted) (quoting *Brandin v. Gottlieb,* 2000 WL 1005954, at *28 (Del. Ch. July 13, 2000)).

[220]  *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2009 WL 458779, at *9 (Del. Ch. Feb. 23, 2009).

89

to adjust the award by . . . reducing the award to account for the limited success."[221] Because Plaintiffs were only partially successful in this case, I award them 50% of their fees under Section 16.14 of the Operating Agreement.

I further hold that Defendants are jointly and severally liable for Plaintiffs' attorneys' fees. Although Katz was not a party to the Operating Agreement in his individual capacity and only executed the agreement in his capacity as PWA's managing member, he is liable to Plaintiffs in this regard because Section 16.14 of the Operating Agreement states that in any action by a Member to enforce the Operating Agreement, "the prevailing party shall recover from the non-prevailing party its attorneys' fees . . . ."[222] Here, CFT, the Non-Managing Member, brought suit to enforce the Operating Agreement, and Plaintiffs, as the prevailing parties, are entitled to their attorneys' fees against Defendants, as the non-prevailing parties, even though neither Cortese nor Katz are Members of DPW. In so concluding, I also take note that Defendants, in their brief and in the pre-trial Joint Stipulation, sought attorneys' fees in favor of "Defendants," plural, against "Plaintiffs," plural. Defendants, therefore, have implicitly conceded that even non-Member parties to an action to enforce the Operating Agreement are bound by the fee-shifting provision in Section 16.14.

---

[221] *Elite Cleaning Co. v. Capel*, 2006 WL 4782274, at *5 (Del. Ch. Nov. 20, 2006) (quoting *Jefferson v. City of Camden,* 2006 U.S. Dist. LEXIS 46654, at *9 (D.N.J. June 30, 2006)).

[222] Operating Agreement § 16.14.

90

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to partial relief. Plaintiffs proved that PWA materially breached the Operating Agreement and committed an Impermissible Act under Section 6.4(d)(ii) by improperly paying Asset Management Fees to NDC Capital. Plaintiffs also proved that PWA committed an Impermissible Act under Section 6.4(d)(viii) because the Key Persons, Ward and Peter Katz, did not remain actively involved in the operation of the Property Manager's business after October 2013.[223] As a result, CFT had Cause to remove PWA as the Managing Member of the Company, and PWA, therefore, validly has been removed as the Managing Member.

As to the Asset Management Fees, Plaintiffs proved that PWA owes DPW $93,516 in damages, inclusive of pre-judgment interest. And, Plaintiffs proved that they are entitled to recover 50% of their reasonable attorneys' fees and expenses from Defendants under Section 16.14 of the Operating Agreement. Plaintiffs promptly shall file appropriate papers documenting their claimed attorneys' fees and expenses. Within fourteen days of the filing of those papers, Defendants shall file any objections they have to the requested fees and expenses. In all other respects, Plaintiffs' claims for relief against PWA will be dismissed with prejudice. All of Plaintiffs' claims against Defendant Katz, except for the claim for attorneys' fees, will be dismissed with prejudice. An implementing order accompanies this Opinion.

---

[223]    I reject all of the other grounds advanced by Plaintiffs for the removal of PWA as the Managing Member.

91